Chief Justice Durrant,
opinion of the Court:
Introduction
¶ 1 This case, along with State v. Mohamud,[1] requires us to apply the due process analysis we set forth in State v. Tiedemann,[2] which addresses the due process rights of criminal defendants when evidence has been lost or destroyed. On April 23, 2015, defendant Lissette DeJesus was sentenced to an indeterminate term of zero to five years in prison for assaulting a prison guard. She argues on appeal that a video recording of the assault was lost or destroyed by the State and that this loss of evidence violated her due process rights, requiring the dismissal of her case. She also argues that the district court applied the wrong legal standard to her claim by imposing a threshold requirement that she demonstrate a reasonable probability the evidence would have been exculpatory.
¶ 2 We reaffirm today that the due process analysis set forth in Tiedemann does encompass a threshold reasonable probability requirement. Although the district court correctly recognized this threshold requirement, it erred by imposing on Ms. DeJesus an overly stringent interpretation of what constitutes a “reasonable probability” and concluding that she had failed to satisfy the threshold requirement. We also conclude that the court erred in its application of the factors set forth in Tiedemann, and upon our review of Ms. Dejesus’s circumstances, we conclude that the loss of the surveillance footage was sufficiently significant to warrant the dismissal of the State’s case against her. We therefore reverse the district court’s decision.
Background
¶3 On September 27, 2013, Corrections Officer Ronald Hansen was escorting inmates Samantha Dash and Fatima Kahn from their scheduled recreation time back to their cells at the Utah State Prison’s women’s facility. Ms. Dash shared cell 416 with Ms. DeJesus. Ms. Kahn occupied cell 415, located adjacent to Ms. Dejesus’s cell. When Ms. Dash and Ms. Kahn arrived at their cells, Officer Hansen directed Ms. Kahn to stand in front of her cell door. She disobeyed the officer’s order, however, stopping instead in front of Ms. Dejesus’s cell door. Ms. De-Jesus and Ms. Kahn began arguing. Officer Hansen’s partner, who controlled the cell doors from a remote location, opened both doors before Officer Hansen was prepared. With Ms. Dejesus’s door unlocked, Ms. Dash said “check this out” to Officer Hansen and pulled Ms. DeJesus’s cell door open.
*114 ¶ 4 After Ms. Dash opened the door, Ms. DeJesus emerged from her cell, “swung at [Ms.] Kahn,” and the two engaged in “mutual combat.” Officer Hansen pulled Ms. DeJesus off of Ms. Kahn, picked Ms. DeJesus up, and carried her back into her cell. But before he could close the cell door, Ms. DeJesus moved past him and began fighting with Ms. Kahn again. Officer Hansen quickly inserted himself between the women, pushing Ms. DeJe-sus to the floor. While on the floor, Ms. DeJesus kicked Officer Hansen twice—once in the abdomen and once in the thigh,
¶ 5 About thirty minutes after resolving the altercation, Officer Hansen reviewed surveillance footage that had captured the event. He then filed a written report of the incident and gave a copy of the report to his captain. His captain sent the report to the prison investigations unit, and Debbie Kemp, an investigator, came. to the prison about an hour and a half after the incident. She asked if there was surveillance footage of the altercation and was told someone in the control room had viewed it. She asked to view the footage, but the officer who was staffing the control room at ffie time was new and apparently did not know how to replay the footage, preventing Ms. Kemp from viewing the recording. After being shown where the incident occurred and conducting interviews, she returned to the control room and asked that a permanent copy of the footage be made.
¶ 6 After requesting a copy, Ms. Kemp waited for at least 30 days to follow up. She testified that during this time, she was asked to complete “10 ... background check investigation[s] ... [within] three weeks.” This unusually heavy workload forced Ms. Kemp to “put [many things] on the back burner.” When she eventually followed up' to see whether the prison had made a physical copy of the surveillance footage, she learned that no copy had been made.' The captain informed her that “afterSO days, it goes off the camera.” Accordingly, the footage of the incident was irretrievably lost.
¶ 7 On January 14, 2014, the State charged Ms. DeJesus with one count of assault under Utah Code section 76-5-102.5, which provides that “[a]ny prisoner who commits assault, intending to cause bodily injury, is guilty of a felony of the third degree.” Thirteen days later, on January 27, 2014, defense counsel entered his appearance and filed a general discovery request.[3] Two days later, defense counsel filed a supplemental discovery request seeking a “copy of any video of the alleged incident.” Approximately three months later, on May 2, 2014, the State responded that it was “unable to provide any video of the incident as none exist[s] as per the Utah State Prison.”
¶8 On June 17, 2014, the district court held the preliminary hearing. At that hearing, Officer Hansen testified about the alleged assault. He claimed that after he threw Ms. DeJesus to the ground, she “looked directly at [him] and then lacked [him]” “in [the] lower ... abdomen and ... in [the] .. •. right thigh.” On cross-examination, Officer Hansen testified about the location of Ms. Kahn, noting that she “was on my back, I don’t know exactly where she was.... [S]he was no longer on my shoulder though, I could not see her behind me, she was behind me.” Defense counsel emphasized this point, asking, “So she could’ve been as close as inches away but you couldn’t see her?” Officer Hansen responded: “But I could not see her, no.”
¶ 9 Following the preliminary hearing, Ms. DeJesus moved to dismiss the charge under State v. Tiedemann, claiming that the loss or destruction of the surveillance footage constituted a due process violation. She argued that if she kicked Officer Hansen, she did so unintentionally, merely seeking to defend herself from Ms. Kahn. During oral argument on the motion to dismiss, the district court decided it needed additional evidence and scheduled the matter for an evidentiary hearing.
¶ 10 At the evidentiary hearing, Ms. DeJe-sus called Ms. Dash to testify about the event. The State asked the court to instruct Ms. Dash about her right against self-incrimination, noting that “[s]he was originally *115 charged in this case,” which charge had been dismissed without prejudice. The State informed the court and Ms. Dash that, “based on her testimony today, we could refile that case.” In response, Ms. Dash invoked her Fifth Amendment right against self-incrimination and refused to testify.
¶ 11 Officer Hansen also testified at the evidentiary hearing. This time, he said the surveillance footage showed that Ms. Kahn was about four to six feet behind him when he pushed Ms. DeJesus to the ground. On cross-examination, defense counsel pressed Officer Hansen about the testimony he gave at the preliminary hearing that Ms. Kahn “was on his back” and he did not see where she was at the time of the assault. Officer Hansen clarified his prior testimony, noting that at the time of the altercation he did not know precisely where Ms. Kahn was standing, After viewing the surveillance footage, however, he could see that Ms. Kahn was standing four to six feet behind him.
¶ 12 Ms. DeJesus also called Ms. Ataata, who identified herself as Ms. Dejesus’s fian-cée, to testify. Ms. Ataata was incarcerated in an adjacent cell—417—at the time of the altercation and viewed most of the incident. She contradicted Officer Hansen’s testimony, claiming that Officer Hansen, Ms. DeJesus, and Ms. Kahn “were all on the ground.” She also testified that Ms. Kahn did not disengage from Officer Hansen, but remained on his back the entire time, attempting to “[sjwing” “over [Officer Hansen] to get to [Ms.] DeJesus.” The district court, in its memorandum decision, noted that Ms. DeJe-sus was “making facial gestures and expressions of varying sorts to [Ms.] Ataata depending on what [Ms.] Ataata was saying in her testimony.”
¶ 13 After the evidentiary hearing, 'the court determined that it needed a supplemental evidentiary hearing to receive evidence from Ms. Kemp, the investigator from the prison'investigation unit. It was then that Ms. Kemp testified that she attempted to view the recording while at the control unit but could not and that the prison had not preserved a physical copy of the footage. The district court asked her whether “someone has to do anything to make [the footage] disappear,” to which she responded that she did not know, but that she “wouldn’t think so, no.”
¶ 14 The district court subsequently issued a memorandum decision denying Ms. Dejesus’s motion to dismiss. Applying State v. Tiedemann,[4] the court noted that Ms. DeJe-sus had to show, “as a threshold, whether ... it is reasonably probable that the recording would be exculpatory.” The court found that “[h]ere, defendant produced a witness, her fiancé[e] [Ms. Ataata], who said [Ms.] Khan was engaged in fighting with defendant when defendant struck [Officer] Hansen.” But the court “[did] not accept as true.the testimony of [Ms.] Ataata” for three reasons: (1) .the relationship between Ms. Ataata and Ms. DeJesus, (2) Ms. Dejesus’s signals to Ms. Ataata during her testimony, and (3) the fact that Ms. Ataata viewed the events from an angle. Reasoning that because only credible evidence can create a reasonable probability, and because “the testimony [of Ms. Ataata] was not believable,” the district court held that Ms. DeJesus had not satisfied the threshold requirement under Tiedemann.
¶ 15 Despite this conclusion, the court also considered the two factors set out in State v. Tiedemann,[5] reasoning that “[if] the court is wrong about the exculpatory nature of the recording, dismissal is [still] not appropriate.” The court characterized the first Tiede-mann factor as concerned with “the reason for the destruction or loss or failure of preservation of the evidence, including the degree of negligence or culpability on.the part of the State.” The court found that “the reasons given for. the lack of preservation are believable, and amount to negligence but not in a *116 high degree.” The court also stated that “it is very difficult, if not impossible, for this court to understand why prison personnel would not, with full knowledge that a claimed assault had occurred by an inmate against a guard, maintain a recording of that event.”
¶ 16 The court characterized the second Tiedemann factor as concerned with “the [degree] of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.” The court then reasoned that “[o]nly if the recording shows in essence what defendant claims would there be prejudice by its unavailability.” Because the court did “not believe defendant [had] shown any reasonable, believable probability the recording showed what defendant claims,” it concluded that “it does not matter why or how [the footage] was destroyed, or more properly not retained.” Ultimately, the district court held that Ms. DeJesus’s due process rights were not violated by the destroyed surveillance footage and denied the motion to dismiss.
¶ 17 Ms. DeJesus filed an interlocutory appeal with the court of appeals to review the denial of her motion to dismiss. That court denied the petition. Thereafter, she entered a conditional guilty plea to one count of assault by a prisoner, a third degree felony, reserving her right to appeal the denial of her motion to dismiss. The district court, per the prosecution’s recommendation, sentenced Ms. DeJesus to serve zero to five year’s in prison, to run concurrently with her other sentences. Ms. DeJesus timely appealed, and the court of appeals certified the case to us. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(b).
Standard of Review
¶ 18 Ms. DeJesus raises two overarching issues on appeal. First, she argues that the district court incorrectly interpreted State v. Tiedemann to require that a defendant demonstrate a reasonable probability that the lost evidence would have been exculpatory. This question, which requires us to examine the requirements of the due process clause of the Utah Constitution, is a question of law that we review for correctness.[6] Ms. DeJesus also argues that the district court erred in its application of the Tiedemann due process analysis and accordingly incorrectly denied her motion to dismiss. “Whether the State’s destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness,” though we “incorporate a clearly erroneous standard for the necessary subsidiary factual determinations.” [7]
Analysis
¶ 19 The first issue on appeal focuses on the precise requirements of the due process test we announced in State v. Tiedemann.[8] The second issue focuses on that test’s proper application in Ms. DeJesus’s case. We begin our discussion by reviewing our decision in Tiedemann. We reaffirm our earlier conclusion that the due process clause of the Utah Constitution requires a defendant to first establish as a threshold matter a reasonable probability that the lost or destroyed evidence would have been exculpatory. By so doing, the defendant establishes that his or her due process rights have been violated. Once a defendant has made this threshold showing, the court must consider the two factors set forth in Tiedemann—the culpability of the State and the prejudice to the defendant—in order to both evaluate the seriousness of the violation and determine the necessary remedy.
¶ 20 After reviewing Tiedemann, we apply the due process analysis established therein to Ms. DeJesus’s case. We conclude that the district court erred by imposing a higher burden at the threshold level than is required under Tiedemann, and that under the proper standard, Ms. DeJesus met her burden. We also conclude that the court erred in its application of the two Tiedemann factors and that dismissal was an appropriate remedy for the loss of the surveillance footage. Ultimate *117 ly, we reverse the decision of the district court and remand for an entry of dismissal.
I. The Due Process Clause of the Utah Constitution, as Interpreted in State v. Tiedemann, Requires a Threshold Showing that There Is a Reasonable Probability that the Lost or Destroyed Evidence Would Have Been Exculpatory
¶ 21 Ms. Dejesus’s first argument on appeal focuses on the correct interpretation of the due process analysis we articulated in State v. Tiedemann.[9] She argues that the district court erroneously interpreted Tiedemann as establishing a threshold requirement that a defendant show a reasonable probability that lost evidence would have been exculpatory. She claims that the correct due process analysis requires district courts “to consider the [factors found in rule 16 of the Utah Rules of Criminal Procedure,] and the factors considered by other states.” Then, when a defendant has shown a reasonable probability that the lost evidence would have been exculpatory, he or she must show the culpability of the State in the loss of the evidence and the degree of prejudice to the defendant resulting from the lost evidence. The State responds that our articulation of the applicable due process analysis in Tiedemann clearly encompassed a threshold requirement, and that such a requirement comports with other due process standards. We agree with the State.
¶ 22 As we discuss below, our decision in Tiedemann came after the United States Supreme Court’s interpretation of the federal Due Process Clause’s requirements in lost evidence cases. In Tiedemann, we were called on to determine whether the Utah Constitution’s due process clause imposed the same requirements as its federal counterpart. We ultimately departed from the Supreme Court’s approach as a matter of state due process and instead adopted an approach consonant with rule 16 of the Utah Rules of Criminal Procedure, other state courts’ interpretations of their own constitutions, and other due process analyses. This approach encompassed a threshold requirement that the defendant demonstrate a reasonable probability that the lost evidence would have been exculpatory. Only after this threshold showing is met should courts consider the factors set forth in Tiedemann in order to provide an appropriate remedy. Thus, Ms. Dejesus’s argument that the Tiedemann analysis does not require a threshold showing misapprehends our precedent.
¶ 23 Prior to Tiedemann, the United States Supreme Court decided Arizona v. Youngblood,[10] holding as a matter of federal constitutional law that the “failure to preserve potentially useful evidence does not constitute a denial of due process of law” “unless a criminal defendant can show bad faith on the part of the police.”[11] This “bad faith” standard confined constitutional relief “to that class of cases where the interests of justice most clearly require it,” which are those eases “in which the police themselves by their [bad faith] conduct indicate that the evidence could form a basis for exonerating the defendant.”[12]
¶ 24 In Tiedemann we were called on to decide whether the due process clause of the Utah Constitution also required “a defendant [to] show bad faith on the part of the State in the loss or destruction of evidence before he may seek a remedy.”[13] To answer this question, we were guided by rule 16 of the Utah Rules of Criminal Procedure and the approaches of other states’ courts. As we described in Tiedemann, rule 16 “imposes broad obligations on prosecutors” to produce or make available information that can aid the defendant.[14] And a prosecutor’s failure to *118 comply with rule 16’s disclosure requirements permits a defendant to bring a motion to exclude the prosecution’s evidence.[15] Although we recognized the “nonexclusive factors” that courts consider when ruling on such motions,[16] we reiterated that, under rule 16, “[t]he prosecutor’s good faith should not have ... any impact on the trial court’s determination of whether the prosecutor had violated his discovery duties.”[17] We concluded that “[o]ur approach under rule 16 should govern the destruction of evidence.”[18] Thus, we rejected Youngblood’s bad faith requirement, concluding instead—consonant with rule 16—that “the culpability or bad faith of the state should be only one consideration, not a bright line test, as a matter of due process under article 1, section 7 of the Utah Constitution.”[19]
¶ 25 Having rejected the federal constitution’s approach to lost evidence cases, we then discussed what the appropriate approach should be under the Utah Constitution. We were guided in our efforts by looking to our sister jurisdictions.[20] We found the Vermont Supreme Court’s analysis, articulated in State v. Delisle,[21] particularly persuasive. Under the Vermont court’s approach,
if a defendant demonstrated “a reasonable possibility that the lost evidence would be exculpatory,” then the court would determine the proper sanctions by balancing “(1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial.”[22]
Under this approach, a defendant must first “demonstrate! ] ‘a reasonable possibility that the lost evidence would be exculpatory.’ ”[23] Once that threshold is satisfied, the court must review and weigh three factors to determine the proper remedy.
¶ 26 We adopted a substantially similar analysis:
In cases where a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.[24]
This approach encompassed the same threshold showing found in the Vermont analysis, requiring defendants to “show[ ] a reasonable probability that [the] lost or destroyed evidence would be exculpatory.”[25] It also required a “balancing of factors on a case-by-case basis,” which “embrace[d] the basic principles we ha[d] adopted under rule 16 and the factors mentioned by other states.”[26]
¶27 So, contrary to Ms. Dejesus’s argument, the due process analysis we articulated in Tiedemann is not a wide-ranging balancing test that encompasses all of the factors applicable to rule 16—most of which would be difficult if not impossible to directly apply *119 to cases involving lost evidence.[27] Instead, we established' a two-step analysis. First, the defendant must demonstrate a reasonable probability that the lost evidence would have been exculpatory—the threshold requirement. Once a defendant has done so, the court must balance the culpability of the State and the prejudice to the defendant in order to gauge the seriousness of the due process violation and to determine an appropriate remedy. The purpose for this two-part analysis, with its threshold requirement, is to ensure that a defendant only obtains a remedy—and that the State is only sanctioned— when the defendant’s due process rights have actually been violated. Indeed, this approach comports with the due process analysis applicable in other circumstances. -
¶ 28 For example, in Brady v. Maryland,[28] the United States Supreme Court held that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to ‘punishment, irrespective of the good faith or bad faith of the prosecution.”[29] So, to establish a due process violation stemming from the non-disclosure of evidence, a defendant must show a “reasonable probability that [the evidence] would affect the outcome of the trial”[30]—essentially the same threshold requirement we adopted in Tiedemamn. If the evidence ■ that was wrongfully withheld would have had no bearing on the trial’s outcome, a defendant’s due process right to a fundamentally fair trial has not been violated.[31] In the same way, the destruction of evidence violates a defendant’s due process rights only when there is “a reasonable probability that [the] lost or destroyed evidence [was] exculpatory.”[32] Unless the evidence had some chance of affecting the outcome of the trial, a defendant cannot claim a due process violation.
¶ 29 We accordingly reject Ms. Dejesus’s claim that the due process analysis, set forth in Tiedemann for use in lost evidence cases does not require a threshold showing that there is a reasonable probability the lost evidence would have been exculpatory,[33] Under Tiedemann, a defendant must show as a threshold.matter that there is “a reasonable probability that [the] lost or destroyed evidence would be exculpatory.”[34] Only after the defendant has established this point— and accordingly established that there was a due process violation resulting from the loss of evidence—should a court consider the two Tiedemann factors. And these factors—the culpability of the prosecution and the prejudice to the defendant—guide the court’s analysis as to both the seriousness of the due process violation and the remedy that is necessary to rectify the violation.
¶ 30 In reaffirming our holding in Tiede-mann that the due process clause requires the State to preserve exculpatory evidence from loss or destruction, we necessarily reject the.approach advocated by the concurrence. While it agrees with the reasoning of *120 the majority, it argues that we should “root” that reasoning and its concomitant legal principles in “our inherent power to regulate proceedings in our courts,” not “the Due Process Clause of the Utah Constitution.”[35] This proposed adjustment, the concurrence contends, “is a modest one,”[36] “counseled by the doctrine of constitutional avoidance”[37] with a profound “practical and theoretical significance”; it affords us “the power to refine and adjust the standard set forth in Tiedemann.”[38]
¶ 31 The chief obstacle to this proposal is Tiedemann itself. As we noted above, Tiede-mann came in response to the United States Supreme Court decision of Arizona v. Youngblood and its requirement that criminal defendants prove bad faith in the loss or destruction of evidence in order to secure a remedy under the federal constitution.[39] In rejecting this demanding bad-faith standard, we consulted several of our sister jurisdictions that have held that the due process clauses of their state constitutions afford defendants more robust protections than the federal constitution in consequence of lost or destroyed evidence.[40] And after consulting these jurisdictions, we elected to join them, identifying the due process clause of the Utah Constitution as the source of the Tiede-mann test.[41]
¶ 32 The concurrence rightly observes that in Tiedemann we relied on rule 16.[42] But the concurrence relies on this fact to recommend that we “hold that the duty and standards set forth in Tiedemann are a matter of inherent judicial power and enforcement of the terms of rule 16 of our rules of criminal procedure.” [43] This misapprehends Tiedemann. In referencing rule 16, we did not ground the Tiedemann test in our rules of criminal procedure. We instead pointed lower courts to “[o]ur approach under rule 16” where “the culpability or bad faith of the state should only be one consideration, not a bright line test [unlike Youngblood], as a matter of [state] due process.”[44] Rule 16, therefore, does not govern cases of lost or destroyed evidence. It merely provides a helpful framework for applying the Tiedemann test. Without question, we planted the Tiedemann test in constitutional soil.[45]
¶33 Tiedemann aside, the concurrence supports its proposal by relying on the *121 doctrine of constitutional avoidance and on the practical benefits secured by a non-constitutional foundation for the Tiedemann test.[46] As to constitutional avoidance, it is well established that courts “will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.”[47] But the concurrence’s use of this principle is novel. In essence, the concurrence contends that we should avoid procedural due process questions “properly presented by the record” because we have inherent authority to make rules of procedure. Taken to its logical extreme, this would prospectively render much procedural due process in this jurisdiction dead letter. We think this ill advised.[48]
¶ 34 As to the practical benefits secured by a non-constitutional foundation for the Tiedemann test, we agree with the concurrence that “[o]ur constitutional decisions are set in relative stone,” in that “[t]hey place matters resolved by them beyond the policy reach of this or other branches of government, and they establish precedent that we ourselves may be bound by under the doctrine of stare decisis.”[49] But matters resolved by our constitutional decisions often concern fundamental rights. In this case, our decision concerns Ms. Dejesus’s right to a fair trial when facing the deprivation of her liberty. When matters such as this are before us, the proper interpretation and application of the constitution is rightly set in relative stone to ensure that an individual’s fundamental rights are not subject to the ever changing judgments of public policy.
¶ 35 In the end, we have not, as the concurrence suggests, “distorifed] the constitution,” [50] but have simply reaffirmed our precedent regarding the due process concerns that arise when the State is responsible for the loss or destruction of evidence that has a reasonable probability of exculpating a criminal defendant. The concurrence, by contrast, does not propose a “modest” alteration to our precedent but a monumental one. By uprooting the Tiedemann test from constitutional soil, the concurrence would significantly weaken a fundamental right: Whatever protections a defendant receives when faced with lost or destroyed exculpatory evidence would turn on the discretion of a particular judge in the exercise of his or her inherent judicial authority. And appellate review of that exercise would be reviewed for an abuse of discretion.[51] This would be a poor substitute for the protections, including more robust appellate review, that our interpretation of the due process clause affords criminal defendants.[52] We will not invoke the doctrine of constitutional avoidance to essentially erase this court’s previous conclusion that government loss or destruction of exculpatory evidence directly implicates due process.[53]
*122 f 36 The district court correctly imposed a threshold requirement that Ms. DeJesus establish a reasonable probability that the lost evidence would have been exculpatory—a requirement established under our state due process clause. We now review the district court’s conclusion that Ms. DeJesus failed to meet that threshold requirement and its alternative determination that, even if she had, she was not entitled to a dismissal under the two Tiedemann factors.
II. The District Court Erred in Its Application of Tiedemann
¶ 37 The district court articulated two different bases for its denial of Ms. Dejesus’s motion to dismiss, consistent with its understanding of the due process analysis set forth in State v. Tiedemann[54]: first, Ms. DeJesus failed to demonstrate as a threshold matter a reasonable probability that the lost footage would have been exculpatory; and second, even if she satisfied the threshold requirement, she failed to show that the Tiedemann factors required dismissal of her case. We discuss each of these determinations below and conclude that the district court erred in its application of the due process analysis found in Tiedemann to the facts of the case.
A Ms. DeJesus Established a Reasonable Probability that the Lost Footage Would Have Been Exculpatory
¶38 The first basis for the district court’s denial of Ms. Dejesus’s motion to dismiss was that she had failed to establish as a threshold matter that there was a reasonable probability the lost surveillance footage would have been exculpatory. In reviewing the district court’s decision on this matter, we reiterate that we accept its factual determinations unless clearly erroneous.[55] But the district court’s determination of what constitutes a reasonable probability for purposes of the Tiedemann analysis is a legal question reviewed for correctness.[56] So, though we defer to the court’s conclusions as to the facts of Ms. Dejesus’s case, we owe no deference to its determination that those facts fail to satisfy her threshold burden under Tiedemann.
¶ 39 Of course, in order to analyze whether Ms. DeJesus established a reasonable probability that the lost evidence would have been exculpatory, we must first determine what constitutes a reasonable probability for purposes of a defendant’s due process right to exculpatory evidence. Although a “reasonable probability” standard defies a precise definition or quantifiable value, we have described it as “a probability sufficient to undermine confidence in the outcome.”[57] And though it is more than a “mere possibility,” it falls “substantially short of the ‘more probable than not’” standard.[58] Ultimately, in order to satisfy the reasonable probability standard in the lost evidence context, a de *123 fendant must make some proffer as to the lost evidence and its claimed benefit.[59] So long as that proffer is not pure speculation or wholly incredible, the standard will be satisfied.[60]
¶ 40 Our review of the district court’s determination that Ms. DeJesus failed to satisfy the threshold reasonable probability requirement leads us to conclude that the court applied a more stringent standard than the one we just articulated. The court stated that “[t]here must be something in the evidence before the court .,, that shows the court there is some reasonable basis on which to believe the recording would show what defendant claims.” This standard suggests that defendants must provide evidence that the lost or destroyed evidence was in fact exculpatory. This is too high of a burden given both the reasonable probability standard articulated in Tiedemann and the fact that, in many lost evidence cases, there may be little extrinsic, corroborating evidence. Defendants will likely never be able to fully establish exactly what the evidence would have shown. Instead, all a defendant must show is-that there is a reasonable probability the evidence would have been exculpatory.
¶ 41 Applying the correct standard, we conclude that Ms. DeJesus established a reasonable probability that the lost footage would have been exculpatory. She presented the testimony of her fiancée, Ms. Ataata, who testified that Officer Hansen, Ms. DeJesus, and Ms. Kahn “were all on the ground” during the altercation, and that Ms. Kahn “was right there on [Officer Hansen’s] back the whole time,” attempting to “[s]wing ... over him to get to [Ms.] DeJesus.” Because the crime with which Ms. DeJesus had been charged—assault—requires the prosecution to prove “inten[t] to cause bodily injury,”[61] Ms. Ataata’s testimony suggests that Ms. DeJesus may not have intended to cause bodily injury to Officer Hansen, but was instead attempting to strike Ms. Kahn.
¶ 42 The district court found Ms. Ataata’s testimony “not believable” based on the close relationship between Ms. Ataata and Ms. De-Jesus, its finding that Ms. DeJesus appeared to be coaching Ms. Ataata’s testimony, and the fact that Ms. Ataata’s view of the incident was partially Obstructed, as she was viewing it at an angle, “The court- thus d[id], not accept her testimony at face value as being testimony the court can rely on to find the events were as she described.” But the court specifically found that the testimony'was not wholly _ incredible, stating that it was “not indicating such evidence cannot be presented by defendant at a trial” and that “[a] jury may well conclude differently.”
¶ 43 Ms. DeJesus also argues that the testimony of Ms. Ataata is strengthened by the arguably inconsistent testimony offered by Officer Hansen. During the preliminary hearing, the officer testified that Ms. Kahn “was on my back, I don’t know exactly where she was.... [S]he was no longer on my shoulder though, I could not see her behind me, she was behind me,” and seemed to agree with defense counsel’s statement that “she could’ve been as close as inches away but you couldn’t see her?” But during the evidentiary hearing on Ms. Dejesus’s motion to dismiss, he testified that Ms. Kahn was about four to six feet behind him when he pushed Ms. DeJesus to the ground. Officer Hansen explained this discrepancy by stating that his initial testimony went to what he knew of Ms. Kahn’s location during the altercation, but his later testimony was based on his review of the surveillance footage, which clarified where Ms. Kahn actually was standing.
¶ 44 We agree with Ms. DeJesus that this evidence—the testimony of Ms. Ataata and the arguably inconsistent testimony of Officer Hansen—is sufficient to establish a reasonable probability that the lost surveillance footage would have been exculpatory. The *124 evidence put on by Ms. DeJesus was not wholly incredible, and it established that her claim that she did not intend to attack Officer Hansen, but rather was attempting to strike Ms. Kahn, was more than speculation. We emphasize that we do not suggest that Ms. DeJesus has actually established what the lost evidence would have shown; we simply hold that the testimony of Ms. Ataata, when combined with the arguably inconsistent testimony of Officer Hansen, crosses the low threshold of “reasonable probability.”[62] Together, this testimony provides a reasonably probable explanation of both what the lost evidence might have shown and how that evidence could have benefitted Ms. DeJesus. Accordingly, we hold that the district court erred by imposing too stringent a standard on Ms. DeJesus at the threshold inquiry, and that, under the proper “reasonable probability” standard described above, Ms. DeJesus satisfied her threshold burden.[63] We turn now to the district court’s application of the two Tiedemann factors.
B. The Tiedemann Factors Weigh in Favor of Dismissal
¶45 As discussed above, once “a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory,” the defendant has established that a due process violation occurred.[64] If this determination has been made, courts must consider two factors to determine both the seriousness of the due process violation and the remedy that is necessary to ensure that the defendant receives a fundamentally fair trial:
(1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.[65]
And as we stated in Tiedemann, though these two factors guide the analysis, “[t]he touchstone for the balancing process is fundamental fairness.”[66]
¶ 46 The only remedy sought in this case is dismissal.[67] The district court, after considering the two factors discussed above, concluded that such a remedy was unnecessary. We *125 discuss the district court’s consideration of the two factors in turn and conclude that, though the court properly analyzed the culpability of the State in the loss of the evidence, it incorrectly determined that there was no prejudice to the defendant resulting from the lost footage. And upon our consideration of these factors, we conclude that dismissal was an appropriate remedy.
1. Culpability of the State
¶ 47 The district court engaged in a lengthy analysis of the culpability of the State in the loss of the surveillance footage. It rejected the State’s argument—an argument the State made again on appeal—that the State would have had no motivation to destroy or fail to preserve the evidence because the evidence would have supported the State’s case against Ms. DeJesus. As the court reasoned, “If the recording showed exactly as [Officer] Hansen said, certainly it would seem to this court that common sense would indicate that recording would be retained.... The motivation, frankly, to destroy or fail to preserve such a recording would come if the recording supported some other factual situation than the one [Officer] Hansen describes.” Thus, there may have been some motivation by the State to permit the footage to be recorded over and lost. Indeed, the court stated that “it is very difficult, if not impossible, for this court to understand why prison personnel would not, with full knowledge that a claimed assault had occurred by an inmate against a guard, maintain a recording of that event.”
¶ 48 The court also found, however, “that the lack of the evidence ... is [not] related to any ‘decision’ made by anyone.” The facts supporting the court’s decision were that Ms. Kemp, the investigator, asked someone—an employee she did not know—to make a copy of the recording, followed up over thirty days later, and was informed that “if a hard copy had been made, it was lost.” The court noted that Ms. Kemp had failed to follow up within a timeframe that would have permitted the footage to be saved because she was unusually busy at the time and found that “the reasons given for the lack of preservation are believable.” Though it stated that “[t]he investigator should have ... conducted her investigation in a way that retains relevant evidence,” it concluded that “[t]he failure to do so, however, was at most negligence, and not gross negligence and certainly not intentional.”
¶49 The court’s factual findings in this regard have not been challenged by either party and do not appear to be clearly erroneous. Further, we see no error in the legal standard employed by the court in its consideration of the State’s culpability. Accordingly, we agree with the district court that the State has shown “negligence but not in a high degree” by failing to preserve the surveillance footage. We turn now to the second Tiedemann factor.
2. Prejudice to the Defendant
¶ 50 The second Tiedemann factor is “the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.”[68] The district court reasoned that there could be prejudice to Ms. DeJesus resulting from the loss of the evidence “only if the recording shows in essence what defendant claims.” And “[b]ecause [the] court d[id] not believe defendant ha[d] shown any reasonable, believable probability the recording showed what defendant claims,” it concluded that there was no prejudice.
¶ 51 The court’s analysis is flawed because it relied on its earlier conclusion that Ms. DeJesus had failed to establish a reasonable probability that the lost evidence would have been exculpatory—a conclusion that was itself flawed because it imposed too high a burden—to find that there was no prejudice to Ms. DeJesus. This circular reasoning improperly required Ms. DeJesus to establish what the footage would have shown in order to claim that she was prejudiced by its loss. *126 Instead, the court should have focused on the importance • of having video footage of the altercation, given the • other evidence available in the case. When viewed in this light, the high degree of prejudice to Ms. DeJesus becomes readily apparent.
¶ 52 Ms, DeJesus had called two witnesses to testify during the evidentiary hearing on the motion to dismiss as to the events of the altercation. The first witness, Ms. Dash, was Ms. DeJesus’s cellmate during the altercation. As soon as she took the stand, however, the State asked the court to instruct Ms. Dash about her right against self-incrimination, noting that “[s]he was originally charged in this case,” and that the charge had been dismissed without prejudice. The State suggested that, “based on her testimony today, [it] could refile that case.” Ms. Dash apparently took the State’s warning to heart and refused to testify. This left only Ms. Ataata, a fellow inmate and Ms. DeJe-sus’s fiancée, to testify on behalf of Ms. DeJesus. And as the court found, Ms. Ataa-ta’s testimony was less believable due to her close relationship with Ms. DeJesus and her partially obstructed view of the altercation. The State’s evidence, on the other hand, centered entirely on the testimony of Officer Hansen, the officer who was allegedly struck by Ms. DeJesus.
¶ 53 Thus the “context of [this] case”[69] is a literal he-said/she-said dispute between witnesses that would turn on which side’s witnesses were most credible. On the State’s side, we have a peace officer, Officer Hansen. On Ms. DeJesus’s side, we have her fiancée, a fellow inmate, whose testimony was already determined by the district court to be less believable than Officer Hansen’s. It is hard to overstate “the materiality and importance of the missing evidence” in this context.[70] The surveillance footage would have changed the entire nature of the case, potentially permitting Ms. DeJesus to show actions consistent with her claims without needing to rely on a potentially unbelievable witness. Indeed, we can conceive of no other evidence that wouid be as helpful or probative than an actual video recording of the events. Nor can we think of other evidence that can serve as an adequate replacement.
¶ 54 Weighing the two Tiedemann factors, we determine that the State’s failure to preserve the footage is a severe violation of Ms. DeJesus’s right to a fair trial and that dismissal is an appropriate remedy. The State’s negligence forced Ms. DeJesus into a situation where the case turned entirely on the. believability of each side’s witnesses. The State also implicitly, encouraged one of Ms. DeJesus’s witnesses to not testify, leaving only Ms- Ataata to testify on her behalf—-a fellow inmate with a close relationship with Ms. DeJesus who was already found to be less than credible by the court. Thus, Ms. DeJesus was required to attempt to defend against the accusations of the State by pitting the credibility of Ms. Ataata—a witness likely to be seen as biased and not credible— against Officer Hansen. And given the indisputably central role a video recording of the incident would play, we cannot say that the loss of the evidence had only a negligible impact on Ms. .DeJesus’s right to a fundamentally fair trial. We accordingly hold that, under Tiedemann, dismissal is an appropriate remedy. We therefore reyerse the decision of the district court and remand for an entry of dismissal.
Conclusion
¶ 55 The district court erred by applying a more stringent “reasonable probability” standard than is required under the- due process analysis articulated in State v. Tiedemann.[71] When the correct standard is applied, Ms. DeJesus’s proffer as to what the footage may have shown and how the footage would have aided her defense meets the threshold by establishing a reasonable probability that the footage would have been exculpatory. By so doing, Ms. DeJesus established that her due process right to a fair trial was violated. We accordingly must weigh the two Tiedemann factors to gauge the severity of the, due process violation. And based on the negligence of the State in failing to preserve thé *127 footage and the crucial role that footage would have played in the case, we ultimately hold that dismissal is an appropriate remedy. We therefore reverse the district court’s denial of Ms. DeJesus’s , motion to dismiss and remand for that court to enter an order of dismissal.
Associate Chief Justice Lee filed a concurring opinion, in which Justice Pearce joined.

. 2017 UT 23, 395 P.3d 133.

. 2007 UT 49, ¶ 44, 162 P.3d 1106.

. The general discovery request sought all video recordings prepared during the investigation or prosecution of the case.

. 2007 UT 49, 162 P.3d 1106.

. See id, ¶ 44 ("In cases where a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.'’).

. See State v. Tiedemann, 2007 UT 49, ¶ 12, 162 P.3d 1106.

. Id.

. 2007 UT 49, 162 P.3d 1106.

. 2007 UT 49, 162 P.3d 1106.

. 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

. Id. at 58, 109 S.Ct. 333.

. Id.

. 2007 UT 49, ¶ 39, 162 P.3d 1106.

.Id. ¶ 40; see also Utah R. Crim. P. 16(a) (requiring prosecutors to "disclose to the defense upon request” several categories of evidence or information, including all "evidence known to the prosecutor that tends to negate the guilt of the accused, mitigate the guilt of the defendant, or mitigate the degree of the offense for reduced punishment”).

. See Tiedemann, 2007 UT 49, ¶ 41, 162 P.3d 1106.

. Id.

. Id. ¶ 40 (citation omitted).

. Id. ¶ 41 (emphasis added).

. Id.

. See id. ¶¶ 42-43 (citing and discussing cases).

. 162 Vt. 293, 648 A.2d 632, 642-43 (1994) (discussed in Tiedemann, 2007 UT 49, ¶ 43, 162 P.3d 1106).

. Tiedemann, 2007 UT 49, ¶ 43, 162 P.3d 1106 (quoting Delisle, 648 A.2d at 642-43).

. Id. (citation omitted).

. Id. ¶ 44.

. Id.

. Id. This test encompasses two aspects: first, it encompasses "the basic principles” of rule 16, including the principle that "the culpability or bad faith of the state should be only one consideration” in our due process analysis. Id. ¶ 41. Second, it encompasses the factors adopted by other states, particularly the culpability or bad faith of the State and the prejudice to the defendant in light of the remaining evidence. See id, ¶ 43.

. See id. ¶ 41 (discussing the "nonexclusive factors we consider under rule 16,” which include "(1) the extent to which the prosecution’s representation [of the existing evidence] is actually inaccurate, (2) the tendency of the omission or misstatement to lead defense counsel into tactics or strategy that could prejudice the outcome, (3) the culpability of the prosecutor in omitting pertinent information or misstating the facts, and (4) the extent to which appropriate defense investigation would have discovered the omitted or misstated evidence” (alteration in original) (citation omitted)).

. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Id. at 87, 83 S.Ct. 1194 (emphasis added); see also State v. Schreuder, 712 P.2d 264, 276 (Utah 1985) ("[A] criminal defendant will prevail on a Brady claim 'where the evidence is favorable to the accused and is material either to guilt or to punishment.’” (quoting Moore v. Illinois, 408 U.S. 786, 794, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972))).

. Schreuder, 712 P.2d at 276.

. See Tiedemann, 2007 UT 49, ¶ 45, 162 P.3d 1106.

. Id. ¶ 44,

. We note that the court of appeals in State v. Jackson apparently interpreted Tiedemann in line with Ms. Dejesus's argument—i.e., without any threshold requirement. See 2010 UT App 328, ¶¶ 10, 19-21, 243 P.3d 902. To the extent Jackson suggests that the relevant due process analysis does not require a defendant to meet this threshold burden, it is overruled;

. Tiedemann, 2007 UT 49, ¶ 44, 162 P.3d 1106.

. Infra ¶ 58.

. Infra ¶ 59.

. Infra ¶ 58.

. Infra ¶ 59.

. Youngblood, 488 U.S. at 58, 109 S.Ct. 333 (holding as a matter of federal constitutional law that the "failure to preserve potentially useful evidence does not constitute a denial of due process of law” "unless a criminal defendant can show bad faith on the part of the police”).

. Tiedemann, 2007 UT 49, ¶ 42, 162 P.3d 1106 (collecting cases). Concerning the concurrence's claim that some of die authorities cited by Tiede-mann "were tied to a large extent to the standards like that set forth in our criminal rule 16,” infra ¶67, we note that we read diese cases differently. While each case discussed rules of criminal procedure, each holding was ultimately based on its state's due process clause. See, e.g., State v. Delisle, 162 Vt. 293, 648 A.2d 632, 642-43 (1994) ("adopt[ing] as the state constitutional standard” a three-factor test under the state due process clause and concluding that the loss of evidence did not violate defendant's due process rights because he cross-examined a medical examiner who provided the defendant favorable testimony regarding the missing evidence); Thorne v. Dep’t of Public Safety, 774 P.2d 1326, 1330 (Alaska 1989) (holding that the appellant’s "due process rights at the revocation hearing were violated by the state’s failure to preserve the videotape”).

. Tiedemann, 2007 UT 49, ¶ 44, 162 P.3d 1106.

. Infra ¶ 67.

. Infra ¶ 58.

. Tiedemann, 2007 UT 49, ¶ 41, 162 P.3d 1106.

. The concurrence acknowledges "that Tiedemann purported to state a requirement of state due process" and concludes that we should "leave open the possibility that our Utah Due Process Clause may have a role to play in establishing a 'floor' or minimum standard protecting an accused whose defense is interfered with by the destruction of material evidence.” Infra ¶68. But the concurrence does not attempt to identify this floor. And we can think of no more suitable floor concerning the destruction of evidence than the one we describe in Tiedemann—when the State loses or destroys evidence, the court will impose appropriate sanctions aimed at preserving the defendant’s right to a fair trial.

. Infra ¶¶ 58-59.

. Slack v. McDaniel, 529 U.S. 473, 485, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (quoting Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)).

. We recognize in this case that the concurrence does not advocate the creation of a new rule but argues that rule 16 governs cases dealing with the loss or destruction of evidence. Yet encouraging courts to rely on inherent judicial powers to avoid constitutional issues will lead to the problem described above. In addition, we note that in avoiding certain constitutional issues, the concurrence would create new constitutional issues, as new rules rooted in our court's inherent judicial authority or in our rulemaking power could be subject to constitutional challenge on the ground that they provide less protection than constitutionally mandated.

. Infra ¶ 70.

. Infra ¶ 77.

. See State v. Dick, 2012 UT App 161, ¶ 2, 280 P.3d 445 ("A trial court's ruling on a rule 16 issue is reviewed for an abuse of discretion.”); see also Coroles v. State, 2015 UT 48, ¶ 24, 349 P.3d 739 (concluding that in the civil context, a court's decision to sanction a party for its failure to comply with a discovery deadline is reviewed for an abuse of discretion).

. See Tiedemann, 2007 UT 49, ¶ 12, 162 P.3d 1106 ("Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness.”).

. The concurrence argues that our reasoning in this regard is circular, in that we assume the Tiedemann standard to be required by the Utah Constitution’s due process clause. Infra ¶81. But this simply highlights our disagreement with the concurrence. The concurrence does not view *122 the Tiedemann standard as having been dictated by the Utah Constitution. For the reasons explained above, we disagree. We view Tiedemann to have held that the standard it articulates is required by the Utah Constitution. So we would be weakening a fundamental right by avoiding the question of whether the Tiedemann standard is required by the Utah Constitution. If we were addressing in the first instance whether the Utah Constitution requires the Tiedemann standard, then it would indeed be circular to claim that we would be weakening a fundamental right if we failed to adopt that standard. But because we read Tiedemann as holding that the Utah Constitution does indeed require that standard, we can say that grounding the Tiedemann standard in a procedural rule, rather than the Utah Constitution, would weaken the right.

. 2007 UT 49, ¶ 44, 162 P.3d 1106.

. See id. ¶ 12.

. See id.

. State v. Knight, 734 P.2d 913, 920 (Utah 1987) (citation omitted). The parties have argued at some length over whether a "reasonable probability” is a different standard than a "reasonable possibility" or a "reasonable lilcelihood"—stan-dards that have been employed by other courts. See, e.g., State v. Delisle, 162 Vt. 293, 648 A.2d 632, 642 (1994) (employing a "reasonable possibility” standard to a due process claim founded on lost or destroyed evidence). But we see little substantive difference between any of these articulations. See Knight, 734 P.2d at 920 (stating that a "reasonable probability” is "substantively identical” to a "reasonable likelihood”). Thus, though we use the phrase "reasonable probability” to maintain consistency with Tiedemann, we believe that the distinctions between these various articulations—if any exist—are of no practical effect.

. Knight, 734 P.2d at 920.

. Cf. State v. Nielsen, 727 P.2d 188, 193 (Utah 1986) (holding that in order to establish a due process violation resulting from the prosecution’s refusal to disclose the identity of a confidential informant, "a defendant must make some showing that disclosure of an informant’s identity is material and essential to his defense” (emphasis added)).

. Cf. State v. Mohamud, 2017 UT 23, ¶¶ 24, 26, 395 P.3d 133 (holding that a defendant failed to satisfy the reasonable probability standard when he provided only speculation as to what the lost evidence would have shown).

. Utah Code § 76-5-102.5.

. The State argues that "all credible evidence ... demonstrated that the lost footage would not have been favorable to the defense but instead would have conclusively proven the State's case.” But it is usually inappropriate to permit the State to undermine a defendant’s claim that there is a reasonable probability that lost evidence would have been exculpatory by having the State describe what the evidence actually showed. The reasonable probability threshold inquiry does not involve a balancing of evidence to determine which side's story about the lost evidence is more believable and whether the evidence was in reality inculpatory or exculpatory; it focuses entirely and solely on whether the defendant can show a reasonable probability that the evidence would have been exculpatory. If we were to hold otherwise, the State would be in-centivized to destroy relevant evidence and later claim that the evidence would have only supported its own version of the events. It is the State's duty to preserve relevant evidence, and it cannot escape that duty—or the consequences of its breach of that duty—simply by putting on evidence as to what the lost evidence would have shown.

. By concluding that the district court applied an incorrect standard, we do not wish to be critical of that court. The court’s error stemmed from the dearth of precedent interpreting and applying Tiedemann. Indeed, as the court itself noted, "Just what is 'reasonably probable’ is not as clear as the court would like.”

. Tiedemann, 2007 UT 49, ¶ 44, 162 P.3d 1106.

. Id.

. Id. ¶ 45.

. Both Ms. DeJesus and the defendant in State v. Mohamud sought only dismissal as the remedy for lost evidence. See Mohamud, 2017 UT 23, ¶ 5, 395 P.3d 133, We note, however, that Tiedemann speaks in terms of "sanctions” and "strik[ing] a balance [to] preserve! ] defendants' constitutional rights without undue hardship to the prosecution.” 2007 UT 49, ¶ 45, 162 P.3d 1106. Nowhere is dismissal mandated as the sole remedy. Because "[t]he touchstone for the balancing process is fundamental fairness,” courts may find that other, less drastic remedies may adequately protect the due process rights of criminal defendants. Id. These remedies may include jury instructions requiring the jury to infer that the lost evidence would have corroborated the defendant's version of events, prohibitions on witnesses who would testify as to the content or subject of the lost evidence, or increased time for discovery. Of course, in cases where the State's *125 culpability and the prejudice to the defendant is sufficiently great, dismissal may be the only remedy that can adequately protect the due process rights of the defendant.

. Tiedemann, 2007 UT 49, ¶ 44, 162 P.3d 1106.

. Id.

. Id.

. 2007 UT 49, ¶ 44, 162 P.3d 1106,