**2025 UT App 132**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RYAN SCOTT HATCH,
Appellant.

Opinion
No. 20230324-CA
Filed August 28, 2025

Sixth District Court, Kanab Department
The Honorable Mandy Larsen
No. 211600066

Scott F. Garrett and Jessica Griffin Anderson,
Attorneys for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1     A hunter, Alan Hamberlin, and a guide, Ryan Scott Hatch, claimed to have shot a mule deer in Arizona—where they had a tag to hunt—that later wandered into Utah. The duo said they tracked the wounded deer to the spot where it died, field dressed it, and then carried its parts back to Arizona. However, a different hunting party reported to authorities that the deer was actually shot in Utah. Wildlife authorities conducted an investigation, which produced significant evidence supporting that the deer was, in fact, shot in Utah. Hatch was thereafter charged with and convicted of assisting in wanton destruction of protected wildlife.

On appeal, he asserts several claims of ineffective assistance of counsel. We reject his claims and affirm his conviction.[1]

BACKGROUND

¶2      Hamberlin had a mule deer tag for Arizona's unit 12B near the Utah border and set out to hunt with Hatch and other acquaintances. Hamberlin claimed to have shot a deer in Arizona, south of the Utah border. He said that the wounded deer then moved northward into Utah, which made him feel obligated to pursue it. Ultimately, Hamberlin and Hatch located the deer where it had collapsed and died, and they proceeded to field dress it.[2]

¶3      Another group hunting in unit 12B used scopes to track a deer several miles into Utah. Lacking Utah hunting tags, they didn't pursue it and observed it "bed down" in Utah. A few hours later, some members of this group heard a single gunshot from the north. Approximately five to fifteen minutes after the shot, this group saw Hamberlin and Hatch near the spot in Utah where the deer had bedded down. They then observed Hamberlin and Hatch field dress the deer. One of the group's members called a tipline to report Hamberlin and Hatch to wildlife authorities, providing GPS readings for a possible location of the deer.

---

1. This decision concerns Hatch's conviction and appeal, but it is a companion case to and shares facts with *State v. Hamberlin*, 2025 UT App 131, which addresses Hamberlin's conviction and appeal. A more fulsome recitation of the facts and procedural history can be found in *Hamberlin*.

2. Field dressing refers to the process of removing the internal organs at the site of the kill to preserve the meat and other valuable parts of the animal. *See Center for Biological Diversity v. United States Forest Service*, 80 F.4th 943, 947 (9th Cir. 2023).

¶4    Following the report, wildlife officers from both Arizona and Utah launched an investigation, leading to the discovery of a headless, skinned, and quartered deer carcass in Utah, just over a mile from the border. Tracks from Hamberlin, Hatch, and the deer were found around it, and DNA samples were collected. Other officers—who did not yet know that the carcass had been discovered—questioned Hatch and Hamberlin at their Arizona campsite about a deer one of them had shot. They denied that the deer had been shot in Utah but made no mention of it running across the border. Officers took a tooth sample from the deer head, and later testing revealed that it matched the DNA from the carcass. After they learned the carcass was found in Utah, officers returned to the camp to seize boots and deer parts from Hatch and Hamberlin, only to find that Hatch had already left with the deer parts. When he was pulled over shortly after, he avoided questions about the location of the deer parts and where the deer was shot. While Hatch's boots were seized, the deer parts and Hatch's cellphone were not recovered.

¶5    Further investigation of the carcass revealed bullet fragments in the deer and a premortem heart injury. One investigating officer photographed the heart but did not preserve it. Officers located the "kick-out" spot in Utah, where there was a "half-moon shape" in the sand showing where the deer kicked-out the sand when it was shot. They also found a suspected location in Utah from which the shot had been fired, which showed signs of kneeling or sitting and that a bipod or tripod had been used in the area. After being shot, the deer had run 117 yards to where its carcass was ultimately found. Boot prints matching Hamberlin's and Hatch's footwear were found at the carcass location and converged with the deer's tracks at the kick-out spot. The deer tracks were entirely within Utah, with no tracks found coming from Arizona. Officers also followed Hatch's and Hamberlin's boot prints from the carcass location to a road in Arizona. Based on this evidence, Hatch was charged with aiding or assisting in wanton destruction of protected wildlife and obstruction of justice.

¶6 At the parties' joint trial, the State presented testimony from members of the other hunting group and wildlife officers. These witnesses, many of whom were experienced hunters and guides, testified about how deer behave after being shot. They generally agreed that a deer with heart or gut damage would not typically run a mile or more after being shot. One investigating officer, who had expertise in ballistics, specifically testified that the wound to the heart that he observed would not have allowed the deer to travel over a mile. These witnesses also consistently emphasized that if a deer leaves the hunting boundary after being shot, the proper procedure is to contact state wildlife officers.

¶7 Hamberlin testified that he shot the deer approximately 300 yards inside Arizona but it subsequently ran north into Utah. He said that he and Hatch tracked the wounded animal and, while being uneasy about its proximity to the Utah border, they were unable to call and notify wildlife authorities due to a lack of a phone signal. Hatch did not testify.

¶8 The State had conceded that the jury should not return a guilty verdict on the obstruction of justice charge because the facts supporting it all occurred in Arizona. Accordingly, Hatch was acquitted on that charge, but he was convicted of assisting in wanton destruction of protected wildlife.

ISSUE AND STANDARD OF REVIEW

¶9 Hatch appeals, raising three claims of ineffective assistance. A claim of ineffective assistance raised for the first time on appeal presents a question of law. *State v. King*, 2024 UT App 151, ¶ 14, 559 P.3d 96.

ANALYSIS

¶10 To succeed on a claim of ineffective assistance of counsel, a defendant must satisfy two fundamental legal requirements:

(1) proving that counsel's performance was deficient and (2) proving that this deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to establish either deficient performance or prejudice "defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (cleaned up).

¶11 To show deficient performance, a defendant must demonstrate "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Courts operate with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Consequently, "even if an act or omission [was] inadvertent and not due to a purposeful strategy, relief is not automatic." *State v. Torres-Orellana*, 2021 UT App 74, ¶ 28, 493 P.3d 711 (cleaned up), *aff'd*, 2024 UT 46, 562 P.3d 706. The determination of deficient performance ultimately hinges on "whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶12 To establish prejudice, the defendant is required to demonstrate that counsel's deficient performance harmed the defense. *Strickland*, 466 U.S. at 687. This means that the "defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (cleaned up). And the errors must be severe enough to erode our "confidence in the outcome." *Strickland*, 466 U.S. at 694. Accordingly, when determining prejudice, an appellate court thoroughly considers the totality of the evidence. *See Torres-Orellana*, 2021 UT App 74, ¶ 29. This assessment includes examining various factors, including whether the errors affected the entire evidentiary picture or had only an isolated impact and "how strongly the verdict [was] supported by the record." *See id.* (cleaned up). Courts are generally "more readily" inclined to conclude errors are "harmless when confronted with overwhelming evidence of the

defendant's guilt." *State v. King*, 2010 UT App 396, ¶ 35, 248 P.3d 984 (cleaned up). Conversely, courts are "more willing to reverse when a conviction is based on comparatively thin evidence." *Id.*

## I. Preservation of Evidence

¶13    Hatch first claims that his counsel (Counsel) rendered ineffective assistance when he allowed "the trial to proceed without objecting to the destruction of the deer's heart." He argues that the "key evidence in this case was the deer's heart." And he says the "State did not preserve the heart or any of its tissues, did not send the heart for further investigation or testing, and did not make the heart available to the defense," leaving it to decompose instead. "Given these circumstances," Hatch asserts, "it was error for [Counsel] not to file a motion to address the destruction of this key evidence, the impact on [his] due process rights, and an appropriate remedy" under the principles articulated in *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106. *See id.* ¶ 44 ("In cases where a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.").

¶14    "To determine whether the State's [loss or] destruction of potentially exculpatory evidence violates due process, the Utah Supreme Court has established a threshold requirement that is followed by a balancing test." *State v. Steele*, 2019 UT App 71, ¶ 15, 442 P.3d 1204 (cleaned up). First, a defendant must "establish as a threshold matter a reasonable probability that the lost or destroyed evidence would have been exculpatory." *State v. DeJesus*, 2017 UT 22, ¶ 19, 395 P.3d 111. "Only after the defendant has established this point—and accordingly established that there was a due process violation resulting from the loss of evidence—

should a court" move on to "balance the culpability of the State and the prejudice to the defendant in order to gauge the seriousness of the due process violation and to determine an appropriate remedy." *Id.* ¶¶ 27, 29.

¶15 But Hatch cannot show that *Tiedemann* and its progeny are applicable here, because he has not made a threshold showing of a reasonable probability that the deer's heart would have been exculpatory. *See State v. Mendoza*, 2025 UT App 46, ¶ 20, 568 P.3d 265 (noting that *Tiedemann* doesn't apply when a defendant "cannot meet the threshold requirement of showing a reasonable probability that the [lost or destroyed evidence] would have been exculpatory"), *cert. denied*, 570 P.3d 661 (Utah 2025).

¶16 Hatch resists the conclusion that the heart evidence would not have been exculpatory by arguing, "based on the facts," that "further testing of the heart would have revealed that any alleged damage to the heart was superficial and not immediately fatal." But in fact, the State never presented any evidence that the bullet fragment entered the deer's heart or that the heart suffered internal damage. At best, further testing would have shown that damage to the heart was limited to what the State's evidence indicated: a laceration to the side of the heart that the investigator had observed and photographed. The State never presented evidence that suggested damage beyond this. Given this circumstance, we have no trouble concluding that even if the heart had been preserved and undergone further testing, it would have revealed nothing undercutting what the State's investigator had testified to. Consequently, the heart evidence that Hatch now complains was destroyed would have, at best, simply confirmed the evidence the State had already presented. In other words, there would have been no point in preserving the actual heart to prove that there was no internal damage when the State's investigator never asserted a bullet fragment caused internal damage to the heart. Accordingly, this claim of ineffective assistance fails because there was no basis for Counsel to allege a due process violation since there was not a threshold showing that the heart evidence would have been exculpatory. For this reason,

Counsel could have reasonably concluded there was no point in asserting a *Tiedemann* due process violation. Accordingly, this claim of ineffective assistance fails for lack of deficient performance.

## II. Moving for a Continuance

¶17 Hatch next argues that Counsel's decision to not seek a continuance in response to the allegedly late notice of the State's investigator as an expert witness constituted ineffective assistance.[3] More specifically, Hatch argues that Counsel should not have waived the right to a continuance before trial due to the State's untimely expert disclosure and should have sought a continuance during trial to obtain a rebuttal expert for the investigator's testimony about the heart. This claim of ineffective assistance fails on both the deficient performance and prejudice prongs, and we address each in turn.

¶18 Counsel did not perform deficiently in failing to move for a continuance to obtain a rebuttal expert who could opine about the deer's cause of death, either on notice grounds pretrial or during trial. As our supreme court has made clear, "counsel has a duty only to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Menzies v. State*, 2014 UT 40, ¶ 183, 344 P.3d 581 (cleaned up), *abrogated on other grounds by McCloud v. State*, 2021 UT 51, 496 P.3d 179. And while "there must be a reasonable,

---

3. Hatch complains that proper notice was similarly not provided for the State's other expert witnesses and that Counsel should have sought a continuance for these witnesses, too. But Hatch has not developed this argument in his briefing in any meaningful way with regard to these other expert witnesses. Accordingly, this issue, insofar as it extends to witnesses other than the investigator, is inadequately briefed, and we will not consider it further. *See State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("It is well established that a reviewing court will not address arguments that are not adequately briefed.").

articulable reason for not interviewing a particular witness or for not following a particular lead, . . . the mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Id.* (cleaned up). Instead, in "any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

¶19    Here, the record makes clear that Counsel investigated the need for experts before trial. After all, Counsel retained a retired wildlife officer with a degree in wildlife management to testify as an expert rebuttal witness. A "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. It is entirely within the realm of adequate assistance for counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. This means that even when there are "any number of hypothetical experts . . . whose insight might possibly have been useful," counsel is nevertheless "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011).

¶20    Given the discretion to engage in reasonable trial tactics and strategies, it was also reasonable for Counsel to avoid transforming "the case into a battle of the experts." *Id.* at 109. Whether to choose one particular expert over another is a quintessential strategic decision that we are loath to second-guess with the benefit of hindsight. *See State v. Houston*, 2015 UT 40, ¶ 90, 353 P.3d 55 (characterizing the assertion "that appellate counsel would have called and retained different experts than those trial counsel decided to present to the jury" as a tactical decision);

*Brown v. State*, No. 09-22-00057-CR, 2023 WL 5948365, at *3 (Tex. App. Sept. 13, 2023) (stating that because the court could "imagine a strategic motivation for not retaining or calling another expert," the defendant had "failed to overcome the presumption that this was sound trial strategy"); *Hall v. State*, No. E2004-01635-CCA-R3-PD, 2005 WL 2008176, at *32 (Tenn. Crim. App. Aug. 22, 2005) ("Counsel's decision not to call another expert is one of trial strategy, and we will not second-guess that decision on appeal."); *cf. McCloud v. State*, 2021 UT 51, ¶ 38, 496 P.3d 179 ("Counsel did not perform deficiently by not consulting experts; rather, he made a reasonable strategic decision based on the law and facts of the case and his theory of the defense.").

¶21 One reasonable strategic basis for Counsel to have chosen *not* to call an additional expert was to avoid the risk of the State calling its own rebuttal experts in response. The State had, in fact, informed the district court that it was prepared to call additional experts: (1) an experienced heart surgeon who had "shared his professional opinion about the many ways a laceration to the heart would be fatal" and (2) a doctor of veterinary medicine who worked for the Utah Division of Wildlife Resources. In this scenario, Counsel would know that Hatch faced a numerical disadvantage, with the State having more experts than Hatch. Thus, Counsel could have reasonably wanted to steer clear of what looked like a losing battle and avoid giving the State the chance to present more robust testimony through these additional experts. This demonstrates how the decision to hire a particular expert, or to forgo one, is deeply strategic and is aimed at managing potential risks and advantages in court—a decision on the part of counsel that is inherently reasonable in many circumstances, this one included.

¶22 In addition to failing to show deficient performance, Hatch has not demonstrated how he was harmed—even if we were to assume that Counsel's performance fell short of reasonable representation. Several reasons compel this conclusion.

¶23   First, as we noted, the State never argued that there was internal damage to the deer's heart. Indeed, the State's investigator did not claim that a bullet fragment caused such damage. Rather, he said the bullet fragment went "through-and-through" along the side of the heart. In fact, he specifically stated that he had used a metal detector to determine that there were no bullet fragments in the deer's heart. And he testified that he inspected the heart completely by holding it in his hands and found no other wounds. In other words, the State never presented evidence that the deer was shot in the heart such that it caused any internal damage. Other expert evidence that Hatch asserts should have been obtained would have, at best, offered additional evidence about the damage to the heart, but the amount of damage to the heart was never really in question.

¶24   Second, there was abundant physical evidence that the deer was in Utah when it was shot, was shot from a point in Utah, and died in Utah. Investigators pinpointed where the deer was located when it was shot. From this location, they determined the path it took to the spot where it died. Moreover, they identified the location from where the shot was likely taken. And perhaps most telling, all the deer's tracks were found entirely in Utah. For Hatch and Hamberlin's version of events to have been believable to the jury, there would have had to have been evidence of deer tracks leading from Arizona into Utah. But no tracks were ever found—in spite of the fact that they would have been readily visible along with the tracks that were found in Utah. Hatch has not assailed or undercut the evidentiary picture these facts established.

¶25   In addition, the other hunting party heard the shot that killed the deer and then saw Hamberlin and Hatch field dressing the deer no more than fifteen minutes later. And if the deer had been shot in Arizona, they would have needed much more than fifteen minutes after shooting the deer to get to the location in Utah where they began field dressing it for Hamberlin and Hatch's story to be credible. In short, given this abundant evidence that the deer was never in Arizona during the events

that resulted in its death, there is simply no likelihood of a better result for Hatch even if he had another expert testify. That his expert *could* have testified that the deer *could* have traveled for some distance after sustaining such a wound to the heart would have done nothing to overcome the weighty evidence that the deer was in Utah throughout the episode. Consequently, any testimony Hatch's proposed expert could have offered would have been inconsequential in swaying the jury to adopt Hatch and Hamberlin's version of events. And Hatch has not offered a persuasive argument that the jury would have returned a more favorable verdict had it heard additional expert testimony.

¶26 Because Hatch has failed to show either deficient performance or prejudice, this claim of ineffective assistance of counsel fails.

### III. Objecting to Border-Crossing Testimony

¶27 Hatch's final claim is that he received ineffective assistance when Counsel failed to object to testimony that he and Hamberlin crossed state lines without notifying officials because the crossing concerned "uncharged conduct." He argues that this testimony constituted other-acts evidence that needed to clear the hurdles created by rules 402, 403, and 404(b) of the Utah Rules of Evidence before it could be admitted.

¶28 As our supreme court has stated, "evidence of prior crimes, uncharged misconduct, or bad acts is admissible if it (1) is relevant to, (2) a proper, non-character purpose, and (3) does not pose a danger for unfair prejudice that substantially outweighs its probable value." *State v. Green*, 2023 UT 10, ¶ 64, 532 P.3d 930 (cleaned up). Here, there was no deficient performance because evidence of Hamberlin and Hatch crossing the border was admissible under the rules.

¶29 First, the conduct was obviously relevant since it concerned the very defense that Hamberlin and Hatch were advancing—that the deer had been shot in Arizona and traveled

into Utah, giving rise to an ethical responsibility to pursue the deer over the border to ensure that it did not unduly suffer or go to waste even if they could not notify authorities. In other words, crossing the border without notifying Utah authorities was made relevant by the very story Hamberlin and Hatch advanced at trial.

¶30 Second, there was an obvious non-character purpose for the State to address the fact that Hamberlin and Hatch failed to notify wildlife officers about crossing the border. It was not to attack Hatch's character but to show Hamberlin's and Hatch's consciousness of guilt. *See State v. Haynes*, 2025 UT App 75, ¶ 45, 571 P.3d 1197 (stating that "consciousness of guilt" is a "plausible purpose[] beyond propensity" that renders evidence "presumptively admissible" under rule 404(b)), *petition for cert filed*, July 21, 2025 (No. 20250823); *see also United States v. Shanshan Du*, 570 F. App'x 490, 499 (6th Cir. 2014) (stating that under federal rule 404(b), the "testimony had an admissible non-character purpose to show knowledge and consciousness of guilt"); *People v. Starr*, No. 219364, 2001 WL 714813, at *1 (Mich. Ct. App. Mar. 16, 2001) (per curiam) ("Consciousness of guilt is a proper noncharacter purpose under [Michigan's rule] 404(b)."); *State v. Dean*, 54 N.E.3d 80, 108 (Ohio 2015) ("[The defendant's] statements in these letters were probative of his consciousness of guilt. Thus, this evidence was relevant to a noncharacter issue and admissible under [Ohio's rule] 404(B)."); *Ary v. State*, Nos. 09-19-00244-CR & 09-19-00245-CR, 2020 WL 6472668, at *15 (Tex. App. Nov. 4, 2020) ("Because the extraneous offense evidence had relevance apart from character conformity, we conclude that the trial court did not abuse its discretion in determining that the text messages were admissible under Rule 404(b)."). The State's case rested on the premise that Hamberlin and Hatch shot the deer in Utah and thus would not have done anything to arouse the attention of Utah authorities. In other words, Hatch and Hamberlin's silent crossing of the border was not done because of hunter ethics but as a surreptitious attempt to avoid detection in pursuit of a trophy mule deer that was off-limits.

¶31 Third, the probative value of the quiet border crossing obviously outweighed the danger of unfair prejudice. After all, crossing the border was essential to Hamberlin and Hatch's defense. They had to explain why they crossed into Utah from Arizona without notifying authorities. If anything, this evidence helped them because it was essential to their defense. Given this circumstance, the evidence's probative value obviously outweighed the danger of prejudice, unfair or otherwise, because Hamberlin and Hatch's case would have fallen apart without it.

¶32 Because the evidence of the border crossing met these requirements for admissibility, Counsel did not perform deficiently in refraining from lodging an objection. Accordingly, this claim of ineffective assistance fails.[4]

CONCLUSION

¶33 All of Hatch's claims of ineffective assistance of counsel fail. There was no basis to assert a due process claim based on the destruction of the deer's heart because that evidence has not been shown to be exculpatory. Counsel also reasonably declined to move for a continuance to avoid turning the trial into a battle of the experts. Moreover, Hatch has not demonstrated that testimony from his proffered rebuttal expert would have been reasonably likely to change the outcome. And the evidence about crossing the border without notifying state officials was properly admitted, lending no support to a claim of ineffective assistance. Accordingly, Hatch's conviction is affirmed.

_____

4. Hatch also raises an issue of cumulative error. There is no error here to accumulate. Accordingly, we need not address this issue further.