2025 UT App 46

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ALEX CHRISTOPHER MENDOZA JR.,
Appellant.

Opinion
No. 20230471-CA
Filed April 3, 2025

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 211900573

Emily Adams, Freyja Johnson, and Hannah
Leavitt-Howell, Attorneys for Appellant

Derek E. Brown and Ginger Jarvis,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

ORME, Judge:

¶1 Alex Christopher Mendoza Jr. was convicted of murder, felony discharge of a firearm, and possession or use of a firearm by a restricted person after he fatally shot Emilio Salazar at a party. Mendoza appeals, arguing the district court should have granted his pretrial motion to dismiss the charges against him based on the State's failure to preserve the gloves Salazar wore when he was shot. Mendoza also argues the court abused its discretion in denying his motion for a new trial based on alleged juror misconduct. We disagree with Mendoza on both fronts and affirm his convictions.

BACKGROUND[1]

¶2    Several people, including Salazar, were gathered at the home of Tiffany and Marco[2] one night when Mendoza arrived. Mendoza began arguing and "going back and forth" with Salazar, and Marco eventually pushed Mendoza out the door. Mendoza taunted Salazar, goading him to come outside. Eventually Salazar did go outside. He was wearing gardening gloves at the time. Witnesses saw Salazar raise his arms in a fighting stance and pull at his waistband. But they did not see him holding a gun. Marco, who was then standing between Salazar and Mendoza, later testified that Mendoza stepped to the side and pulled out a gun. Three shots were fired, and Salazar fell to the ground with gunshot wounds to the back of his head, his neck, back, shoulder, and left hand.[3]

¶3    Mendoza immediately left the scene. Marco handed Tiffany a .380 caliber gun and told her to get rid of it. She took the gun to a nearby church and threw it in the bushes. Police later recovered that gun and also found a full .40 caliber magazine and .40 caliber ammunition in Tiffany and Marco's home.

¶4    Officers and EMTs arrived and began administering first aid to Salazar, who was in critical condition. Salazar was still wearing his gloves when he was loaded into an ambulance. His clothes were removed to treat his injuries while he was

---

1. "We review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly," presenting "conflicting evidence only as necessary to understand issues raised on appeal." *State v. Herrera*, 2025 UT App 1, n.2, 563 P.3d 416 (quotation simplified).

2. Tiffany and Marco are pseudonyms.

3. One of the shots appeared to have struck Salazar twice— entering his back and exiting through his shoulder before also entering the back of his head.

transported to the hospital. After Salazar was taken into the hospital, one of the EMTs took a photo of the back of the ambulance that showed one of the gloves on the floor. But the gloves were not collected or taken into evidence. Salazar later died at the hospital, and a .40 caliber bullet was recovered from his head.

¶5 Tiffany and Marco were interviewed at the police station. Although they initially stated it had been a drive-by shooting, they later told police that Mendoza had shot Salazar. Police discovered that earlier that night, Marco had received a video message from Mendoza that showed Mendoza pointing what appeared to be a .40 caliber gun at the camera.

¶6 Mendoza was charged with murder, two counts of discharge of a firearm—one with serious bodily injury and the other with bodily injury—and possession or use of a firearm by a restricted person.[4] Mendoza filed a motion to dismiss these charges, arguing the State's failure to preserve Salazar's gloves violated Mendoza's right to due process under the Utah Constitution. After a hearing, the district court denied the motion, concluding the "evidence was lost or destroyed, but not by an act of the State" as there was "no evidence at all that law enforcement ever had had possession of the gloves." Further, the court reasoned that Mendoza could not establish a reasonable probability that the missing evidence would have been exculpatory" because he had "a theory as to what the gloves might have shown, but that theory is speculative."

¶7 The State provided notice that it did not intend to introduce evidence of Mendoza's gang affiliation unless he opened the door by introducing evidence of Salazar's own gang affiliation. At the beginning of trial, the district court imposed a decorum order, which limited court attendees to 10 people on behalf of Mendoza and 10 on behalf of Salazar. The order also

---

4. An additional charge for obstruction of justice was later dismissed.

prevented anyone present in the courtroom from engaging in "provocative, disruptive, distracting uncivil behavior of any kind" and instructed attendees not to "display gang hand signals" or wear "any . . . color which might be interpreted to signify support of any gang."

¶8    At the outset of trial, the court stated that it was "very, very important" that the jurors not do any "independent research whatsoever regarding this case" and that they "keep an open mind." The jurors were instructed regarding Mendoza's presumption of innocence, and they were told not to speak "about this case with anyone, not family, not friends, not even each other" during court recesses. The court also instructed the jurors that it was a violation of their oaths to conduct their "own investigations or communicate about this trial with others" or to use "electronic devices in any way connected to the case" and that they might "face serious consequences" for doing so. The court emphasized this point, stating, "Let me be clear. Do not Google the parties, witnesses, issues, or counsel. Do not tweet or text about the trial. Do not use your smartphones or iPhones to gather or send information on the case."

¶9    The trial then proceeded over four days, with witnesses testifying about the events recounted above. Several of the witnesses identified Mendoza in court, one of whom described him as having "tattoos on his . . . face." The State's evidence included a photo of Salazar, Marco, Tiffany, and other friends who had been present during the shooting—two of whom were displaying hand gestures.

¶10    At the close of trial, the court read the final jury instructions in which it admonished the jurors not to "let any bias, sympathy, or prejudice . . . influence [their] decision in any way." The jury had been deliberating for nearly six hours when several of Mendoza's friends and family gathered outside the courthouse, awaiting the verdict. An unidentified man approached the group at 8:52 p.m., according to security footage obtained by Mendoza's defense counsel. Several of the people in the group later

submitted affidavits recounting the interaction. They said the man had guns—one affiant claiming he had shown them three. The man allegedly told the group that his "wife was on a murder trial" as a juror and he was worried for her safety because he "wasn't sure why it was taking so long." He also allegedly made allusions to gangs. One affiant stated that the juror's husband[5] said that his wife had told him that she was "terrified" because "she was a juror for a . . . 'big gang case.'" The juror's husband never entered the courthouse, and he went on his way. The verdict was returned shortly after.

¶11 The jury found Mendoza guilty of murder, discharge of a firearm with serious bodily injury, and discharge of a firearm with bodily injury. The possession of a firearm charge was tried to the bench, and based on the jury's finding that Mendoza had used a firearm on the night of the shooting, the court found him guilty.

¶12 After learning what had transpired outside the courthouse while the jury deliberated, Mendoza filed a motion for a new trial, contending that the juror's husband's conduct indicated that the juror had relied on extraneous prejudicial information to conclude that this was a gang case and that she had improper communications with her husband regarding the verdict. Mendoza submitted the aforementioned affidavits from his friends, family, and defense counsel in support of the motion.

¶13 In its ruling denying Mendoza's motion, the court found that the "highly circumstantial" allegations in the affidavits required "a huge inferential leap to even suggest that a juror was exposed to extra record facts." The court found there was "a lack of evidence to suggest that the juror's conclusion (if a juror did so conclude) that [Mendoza] had a gang association arose from any outside research or investigation" or that "any such perception was in any way shared or discussed with any other members of

---

5. The affidavits vary in describing the juror as the man's "wife" or "girlfriend." For ease, we refer to the man outside the courthouse as the juror's "husband."

the jury." The court also found "no evidence to suggest there was any improper communication with a juror" and that even if there was, the communication was "not unduly prejudicial" as there was no evidence that such a communication "influenced the jury or the verdict in any way." Accordingly, the court also concluded "that an evidentiary hearing would not be helpful or necessary" to determine whether such juror misconduct occurred.

¶14    Mendoza appeals.

ISSUES AND STANDARDS OF REVIEW

¶15    Mendoza argues the district court erred in denying his motion to dismiss based on the State's failure to preserve Salazar's gloves. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness, though we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. DeJesus*, 2017 UT 22, ¶ 18, 395 P.3d 111 (quotation simplified).

¶16    Mendoza also argues the court should have granted his motion for a new trial based on the alleged juror misconduct. "It is well settled that, as a general matter, the trial court has broad discretion to grant or deny a motion for a new trial," and "we will reverse only if there is no reasonable basis for the decision." *State v. Redding*, 2007 UT App 350, ¶ 8, 172 P.3d 319 (quotation simplified).

ANALYSIS

I. The Motion to Dismiss

¶17    Mendoza argues the district court erred in denying his motion to dismiss based on the State's failure to preserve Salazar's gloves, which Mendoza views as a violation of his right to due process under the Utah Constitution. We disagree.

¶18 "To determine whether the State's [loss or] destruction of potentially exculpatory evidence violates due process, the Utah Supreme Court has established a threshold requirement that is followed by a balancing test." *State v. Steele*, 2019 UT App 71, ¶ 15, 442 P.3d 1204 (quotation simplified). First, under *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, a defendant must "establish as a threshold matter a *reasonable probability* that the lost or destroyed evidence would have been exculpatory." *State v. DeJesus*, 2017 UT 22, ¶ 19, 395 P.3d 111 (emphasis added). "Only after the defendant has established this point—and accordingly established that there was a due process violation resulting from the loss of evidence—should a court" move on to "balance the culpability of the State and the prejudice to the defendant in order to gauge the seriousness of the due process violation and to determine an appropriate remedy." *Id.* ¶¶ 27, 29.

¶19 Mendoza cannot demonstrate that *Tiedemann* is applicable here. He urges that the police or the EMTs who tended to Salazar in the ambulance should have collected the gloves. He asserts that EMTs "are government actors who understand the State's duty to preserve useful evidence." But beyond calling the failure to collect the gloves "negligence," Mendoza points to no authority imposing a duty on the police or EMTs to collect and preserve the gloves. In *State v. Dew*, 2025 UT App 22, *cert. filed*, March 19, 2025 (No. 20250288), we recently determined that *Tiedemann* did not apply where a defendant claimed that the police should have preserved a copy of his wife's text messages. *Id.* ¶ 34. We reached this conclusion, in part, because the defendant had not "directed us to any authority suggesting that *Tiedemann* and its progeny may be read to impose on law enforcement agents an obligation to retain every item they may be authorized by warrant to seize even if such items have no apparent inculpatory or exculpatory value at the time the warrant is executed." *Id.* And "as stated in *Tiedemann*, criminal defendants are entitled to information *possessed by the State* to aid in their defense." *State v. Powell*, 2020 UT App 63, ¶ 51, 463 P.3d 705 (emphasis in original, quotation otherwise simplified). Here, the gloves were never possessed by the State and, thus, their loss is not a violation of due process.

¶20 Furthermore, under *Tiedemann*, Mendoza cannot meet the threshold requirement of showing a reasonable probability that the gloves would have been exculpatory. While this bar is "quite low," the showing cannot be "pure speculation or wholly incredible." *State v. Mohamud*, 2017 UT 23, ¶ 20, 395 P.3d 133 (quotation simplified). Mendoza claims that the gloves would have provided forensic evidence indicating that Salazar himself had a gun on the night of the shooting and that the wounds to his hand were self-inflicted. But no witness testified to seeing Salazar with a gun. And Mendoza has "proffered only speculation as to what" forensic evidence might have been found on the gloves. *Id.* ¶ 19. "This does not rise to the level of reasonable probability." *Id.*

¶21 Thus, the district court properly denied Mendoza's motion to dismiss.

## II. The Motion for a New Trial

¶22 Mendoza also argues the district court should have granted him a new trial or at least convened an evidentiary hearing on his motion because the incident involving the juror's husband indicated that the juror had both relied on extraneous prejudicial information and engaged in improper communication regarding the case. Again, we disagree with Mendoza.

¶23 Under rule 24(a) of the Utah Rules of Criminal Procedure, a district court "may, upon motion of a party or upon its own initiative, grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party." The district court declined Mendoza's invitation to do so here because it determined that, even considering the affidavits—which the court noted contained inadmissible hearsay and were submitted by Mendoza's own family and friends—the allegations therein were "highly circumstantial" and required "a huge inferential leap to even suggest that a juror was exposed to extra record facts." The court also determined there was "no evidence to suggest there was any improper communication with a juror" and that even if there

were, the communication was "not unduly prejudicial, as there is no evidence whatsoever that the juror communicating this with her significant other influenced the jury or the verdict in any way." We see no abuse of discretion here.

¶24　First, there is no evidence suggesting the juror learned extraneous prejudicial information linking the case to gang activity. The district court imposed a decorum order during trial that warned attendees not to wear colors or display hand gestures alluding to gangs. And gang evidence was not presented during trial—at least not directly. But, as Mendoza himself points out, he has a "small tattoo on his temple and his cheek bone" and a photo introduced at trial of Salazar, Marco, Tiffany, and other friends on the night of the shooting shows two people "making signs with their hands." Moreover, the jurors were able to observe dynamics between Mendoza and trial attendees, and among the trial attendees, that are not apparent from the record. The jury was also reminded several times to refrain from researching the case. And "jurors are presumed to have followed a trial court's instructions." *State v. Suhail*, 2023 UT App 15, ¶ 142, 525 P.3d 550 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023).

¶25　It is likewise unclear that the juror had improper communication with her husband regarding the case. The jury had been instructed not to use "electronic devices in any way connected to the case," and again, we presume the jurors followed such instructions. *See id.* The jury had been deliberating for nearly six hours by the time the juror's husband arrived outside the courthouse, which was well past the court's regular business hours. He told one of the affiants that he "wasn't sure why it was taking so long," suggesting he had not, in fact, heard from his wife about the verdict. It would be natural for him to worry about her not returning home at the usual time. And even overlooking the hearsay problems with the statement, the juror could have expressed that she was "terrified" about the verdict just from picking up on the gang-related aspects of the case from observations in the courtroom. This does not necessarily suggest that she shared the particulars of what she thought that verdict

would be with her husband before the jury had even begun its deliberations. And given her impressions of the trial and its attendees, whom the court felt it had to restrict in its decorum order, she could well have been "terrified" about rendering a verdict, whichever way the verdict went. A conviction would not sit well with Mendoza's supporters; an acquittal would leave Salazar's family and friends distraught. It should also be noted that the juror's husband could easily have learned that the case involved gang activity on his own.[6] It is not clear that he did so through the juror.[7]

---

6. *See, e.g.*, Pat Reavy, *South Jordan Man, 19, Charged with Murder is Suspected in 'Multiple Shootings,' Police Say*, KSL.com (Jan. 15, 2021), https://www.ksl.com/article/50088600/south-jordan-man-19-charged-with-murder-is-suspected-in-multiple-shootings-poli ce-say [https://perma.cc/44VN-TQ8Y] ("A documented gang member was charged Friday with murder for allegedly shooting a man multiple times after the two of them got into an argument. Even though he is only 19, Alex Christopher Mendoza Jr. is 'well known to law enforcement and the gang community' and has had '84 involvements with law enforcement between 2013 and 2020,' according to court documents, which also say he is a suspect in 'multiple shootings and more than one homicide.'").

7. Mendoza also argues the district court should have presumed that any communication between the juror and her husband was prejudicial under *State v. Soto*, 2022 UT 26, 513 P.3d 684. But courts should consider *Soto*'s rebuttable presumption only "[o]nce an improper jury contact is shown." *Id.* ¶ 32. And the "presumption only applies when the contact is between a juror and *other court participants*, not jurors and third parties unrelated to the proceedings." *State v. Allen*, 2005 UT 11, ¶ 51, 108 P.3d 730 (emphasis in original). The district court saw no evidence of improper communication between the juror and her husband regarding the verdict. And even if there were, the husband was a third party to the case and prejudice would thus not be presumed. *Soto*, 2022 UT 26, ¶ 53.

¶26    It is entirely speculative as to whether the juror's husband's alleged behavior was prompted by any misconduct on the part of the juror herself. Thus, the district court did not err in denying Mendoza's motion for a new trial.[8]

CONCLUSION

¶27    The State's failure to preserve Salazar's gloves did not violate due process, and thus, the district court correctly denied Mendoza's pretrial motion to dismiss the charges against him. Because there was no evidence that a juror engaged in misconduct, the district court did not abuse its discretion in denying Mendoza's motion for a new trial. Accordingly, we affirm.

———————

8. Mendoza alternatively contends that the district court should have at least held an evidentiary hearing to determine whether the juror engaged in misconduct. But the court found there was "no evidence whatsoever" of misconduct based on the affidavits. Given this, the hearing would have been largely an inquiry into "evidence of discussions among jurors or instances where a juror brings [her] personal experiences to bear on the matter at hand"— which is prohibited by rule 606(b) of the Utah Rules of Evidence. *State v. Maestas*, 2012 UT 46, ¶ 114, 299 P.3d 892 (quotation simplified). Thus, the district court did not abuse its discretion in concluding that "an evidentiary hearing would not be helpful or necessary."