**2025 UT App 131**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ALAN DUDLEY HAMBERLIN,
Appellant.

Opinion
No. 20230212-CA
Filed August 28, 2025

Sixth District Court, Kanab Department
The Honorable Mandy Larsen
No. 211600067

Freyja Johnson and Rachel Phillips Ainscough,
Attorneys for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 A hunter, aided by a guide, claimed to have shot a mule deer in Arizona near the border with Utah, in an area for which he had drawn a tag to hunt. The hunter and guide purportedly pursued the wounded animal into Utah until it succumbed to its injuries and died, at which point they field dressed it and carried certain portions back to Arizona, where an acquaintance picked them up.[1] But another hunting party saw things differently and

---

1. Field dressing refers to the process of removing the internal organs at the site of the kill to preserve the meat and other

(continued…)

reported to authorities that the deer had been illegally shot in Utah. An investigation produced significant evidence that the deer had, in fact, been shot in Utah. A jury convicted the hunter of wanton destruction of protected wildlife. On appeal, the hunter, Alan Dudley Hamberlin, raises several claims of ineffective assistance of counsel. His claims are not availing, and we affirm.[2]

## BACKGROUND[3]

### *The Hunt*

¶2      The events leading to Hamberlin's conviction began when he drew a tag to hunt mule deer in unit 12B, an area of land located in Arizona near the Utah border. Given the border's proximity, knowledge of its exact location was, in Hamberlin's words, "very important." Hamberlin had considered hiring Sam Dieringer to act as his hunting guide but ultimately found his fee too high. He ended up hunting with Ryan Hatch (another guide) and other acquaintances instead.

---

valuable parts of the animal. *See Center for Biological Diversity v. United States Forest Service*, 80 F.4th 943, 947 (9th Cir. 2023).

2. This is a companion case to *State v. Hatch*, 2025 UT App 132, which resolves the guide's appeal from his related conviction of assisting in wanton destruction of protected wildlife.

3. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Skinner*, 2020 UT App 3, n.1, 457 P.3d 421 (cleaned up).

¶3    Hamberlin and Hatch tracked a mule deer, which Hamberlin maintained he shot in Arizona. According to Hamberlin, he was south of the border when he took the shot. But Hamberlin said the deer wandered northward after being hit. Hamberlin recalled being "a little bit nervous" while following the deer, as they were "very close to the border" of Utah. Eventually, they found the deer where it had collapsed and died. They proceeded to field dress it.

*The Report from Another Hunting Party*

¶4    Dieringer and his companions were also hunting in unit 12B that day, specifically near an area known as White Pocket, an area in Arizona just south of the Utah border. This group was tracking two deer: one that was located in Arizona and another that was several miles into Utah. Dieringer's group did not pursue the Utah deer because its members lacked the necessary hunting tags for Utah. But they were watching the Utah deer to see if it would cross into Arizona, where they could legally shoot it. The Utah deer appeared to "bed down" in Utah behind some trees and showed no signs of moving toward Arizona.

¶5    A few hours after seeing the deer bed down, several members of Dieringer's group heard a single gunshot coming from the north. Approximately five to fifteen minutes after the shot, they saw Hamberlin and Hatch in the same spot where the deer had bedded down in Utah. The group then observed Hamberlin and Hatch field dress the deer in the place where it had died. Following these observations, Dieringer used a tipline to report Hamberlin and Hatch to wildlife authorities. Dieringer provided Arizona and Utah officials with a possible location of the deer carcass based on Dieringer's GPS readings.

*The Investigation*

¶6    Wildlife officers from Arizona and Utah launched an investigation upon receiving the report. Officer Stout from the

Utah Division of Wildlife Resources (Utah DWR) found the deer's carcass in Utah by using the coordinates provided by Dieringer and following boot tracks "coming out of the area." The carcass was "headless, skinned, and quartered" and was surrounded by a "bunch of tracks." Though darkness prevented a full necropsy, Officer Stout did collect samples for DNA analysis at that time. The distance from the location of the carcass in Utah to the Arizona border was just over a mile.

¶7      Before learning that Officer Stout had found the carcass, Ranger Legler from the Bureau of Land Management and Officer Pierce from the Arizona Game and Fish Department located Hamberlin and Hatch at their Arizona campsite and asked them about the deer Hamberlin had shot. Officer Pierce told Hatch, "[W]e heard it was shot in Utah." After about a four-second pause, Hatch responded, "[S]hot in Utah? No," insisting instead that they had shot the deer near White Pocket in Arizona. Neither Hamberlin nor Hatch mentioned that the deer had wandered into Utah after being shot. Officer Pierce took a tooth sample from the deer to conduct a DNA analysis. Subsequent testing confirmed that the DNA from the tooth matched the carcass that Officer Stout found in Utah.

¶8      After being informed by Officer Stout that he found the carcass in Utah, Officer Pierce and Officer Six from the Utah DWR returned to the camp area to seize Hatch's and Hamberlin's boots and cellphones and the deer's head and hide. But Hatch had already left the campsite with the deer's parts. He was pulled over near Kanab by a county sheriff, and Officer Six was called to investigate. Officer Six asked Hatch where the head and meat of the deer were, but Hatch "didn't really tell" him and "kind of avoided the question." When Officer Six asked where the deer was shot, Hatch responded that he was "not sure where [they] shot it." Again, Hatch never gave any indication to Officer Six that the deer had been shot in Arizona and then ran into Utah. Officer Six seized Hatch's boots, but the

deer parts and Hatch's cellphone were not located, even after Officer Six searched the vehicle.

¶9     Officers Stout, Pierce, and Six, accompanied by Officer White from the Utah DWR, returned to the location of the carcass the next day to continue the investigation. Officer Stout found three bullet fragments in the carcass—two in the gut and one near the ribs. There was also a laceration to the deer's heart. Officer Stout concluded that the injury to the heart occurred premortem because there was bruising along the edge of the wound. There were no bullet fragments in the heart, nor was there an exit wound in the heart.

¶10     The wildlife officers also investigated the area around the carcass. They identified the area where the deer had bedded down as the "kick-out" spot, which refers to the area where the deer was shot and kicked out with its legs in response to being shot. This particular kick-out spot was "a half-moon shape" in the sand. After leaving the kick-out spot, the deer ran about 117 yards to where it collapsed and its carcass was found. Notably, the kick-out spot was in Utah. Wildlife officers also located the spot from which they suspected the shot that killed the deer had been fired. This area showed "a great disturbance" on the ground—the "sand had been displaced" where someone had been kneeling or sitting and there was "a lot of activity . . . in that spot." This spot was in Utah as well. There were also marks from a tripod or bipod present at the suspected shot location. The walking distance from the suspected shot location to the kick-out spot was just over five minutes or approximately 370 yards.

¶11     Boot prints found near the carcass appeared to match the pattern of the soles of the boots worn by Hamberlin and Hatch. Moreover, Hamberlin's tracks, Hatch's tracks, and the deer's tracks converged at the kick-out spot. From there, the deer's tracks indicated that the animal had been running until it collapsed. Officer White found the deer's tracks concentrated in the areas of

Utah described above and could not find any tracks coming from Arizona to Utah. Further, he did not recall seeing any deer tracks running south to north, which he would have expected to see if hunters were following the deer from Arizona into Utah.

¶12 Officers Pierce and Six followed the boot tracks away from the carcass. They led to a road in Arizona. The walking distance from the carcass to the road where Hamberlin and Hatch were apparently picked up by an acquaintance was about forty-eight minutes.

¶13 Based on this evidence, Hamberlin was charged with one count of wanton destruction of protected wildlife. Hatch was charged with one count of aiding or assisting wanton destruction of protected wildlife and one count of obstruction of justice.

*The Trial*

¶14 At a joint trial, the State presented testimony from members of Dieringer's hunting group and law enforcement officers. They testified to the facts as summarized above and the following as relevant on appeal.

¶15 Colton Lee, a member of the Dieringer group, testified that he heard the gunshot on the day the deer was killed and began making notes to ensure that there would be "a timeline . . . on what had happened." Those notes, which Lee read as part of his testimony, indicated the following: Dieringer had spotted a "big buck, approximately one mile into Utah" around 8:00 a.m.; another member of the group saw Hatch and Hamberlin headed northbound in a truck toward the deer around 8:30 a.m.; around 11:30 a.m., two members of the group heard the gunshot; at around 11:45 a.m., Dieringer saw Hamberlin and Hatch in the spot where the deer had been seen, from which point they tracked it for about a hundred yards; and, also at 11:45 a.m., Hamberlin and Hatch were seen field dressing the deer.

¶16    Lee also testified that he had hunted since he was a "young kid" and had been a guide, hunting around fifty or sixty deer over the years. He testified that there was a "broad spectrum" of how deer react after being shot. He had seen deer run twenty-five or thirty yards and then stop after being shot, but he had also on rare occasion seen them "run and run and run." In addition, Lee testified that if a deer is shot and leaves the hunting boundary, the "proper procedure is to contact" the state's wildlife officers to notify them: "[S]ay it went into Utah, you would contact Utah game and fish and they would document the fact that it was in Utah."

¶17    Dieringer testified that he ran a guide business and had hunted hundreds of times. He agreed that it was "reasonable for a deer . . . shot with heart damage and in the gut . . . to run 125 yards" before lying down and dying but that it "wouldn't be normal" for a deer to run a mile or more after having been shot in that way, explaining that when deer are shot in the vital organs, "it causes too much damage for them to . . . travel that far." Dieringer also said that if a deer is shot and leaves the hunting boundary, a hunter should call wildlife officers to notify them.

¶18    Wyle Soller testified that he was part of Dieringer's group and had guided hunts about thirty-five times. He said that in his experience, if a deer was shot in the gut with some heart damage, it might run for 125 yards before lying down to die. He also testified that, in his experience, a deer would not run for a mile when its heart had been hit by a shot. Finally, Soller stated that if a deer leaves the hunting boundary after being shot, the hunter should call state wildlife officers to report the movement.

¶19    Ranger Legler, who was an experienced hunter, similarly testified that hunters should notify game officers if a deer leaves a hunting boundary after being shot. He further testified that most

deer travel only "a short distance" after being shot and that "if it's a critical wound, heart, lungs, something like that, then they expire pretty quickly."

¶20 Officer Pierce testified that he had "gutshot" three deer, none of which traveled more than a half mile after being hit.

¶21 Officer Stout, who testified about his examination of the deer carcass, stated that he had degrees in zoology and forensic science, with an emphasis in ballistics. He had worked for the Utah DWR for twenty-one years (thirteen of which were spent as an investigator with a focus on ballistic analysis). He stated that he had performed between 300 and 500 necropsies. He testified that he examined the heart of the deer Hamberlin shot and found a "through-and-through" wound on the side caused by a bullet fragment. He clarified that he did not see an "exit hole" caused by a bullet; rather he found a wound "on the edge of the heart, not . . . going through the heart" but "[i]nto the heart on the side." He also stated that he assessed the amount of damage the heart had sustained by "look[ing] at the entire heart" as he held it "in [his] hands."

¶22 Officer Stout further testified that he did not "believe that a deer could run . . . very far with that damage to the heart." Specifically, he concurred that a deer with the damage to the heart he observed could not have traveled over a mile after being shot. Officer Stout stated that while he agreed that the "wound to the heart was a fatal wound," he clarified that the "bullet wound and subsequent damage . . . likely all contributed" to the deer's death and that "what would have killed it most quickly was the damage to the heart." As relevant here, Officer Stout did not collect the heart, instead choosing to document the damage with photographs, which were introduced as evidence at trial. And while he didn't dissect the heart, he used a metal detector to determine that there were no bullet fragments lodged in the organ.

¶23 After the State rested, the defense called Garth Carter, a retired Utah DWR officer with a degree in wildlife management, to testify as an expert witness. When asked if he had ever "seen a gutshot deer run a mile and a half before" dying, Carter replied that while he couldn't recall a "particular incident where it happened," he would not be surprised if it did happen because a wounded animal can "go far," depending on the seriousness of the injury. Carter further described the investigation by the wildlife officers as "botched" because investigating officers "had an opportunity to collect the evidence and they didn't."

¶24 Hamberlin testified in his own defense. He said that he and his hunting party had gone to White Pocket[4] to hunt. Hamberlin said that he and Hatch eventually spotted the deer in question. Hamberlin said he shot the deer at a location that he estimated was about 300 yards inside the Arizona border but then lost sight of it. He claimed that he and Hatch located where the deer was hit and proceeded to track the wounded animal as it headed north. Knowing that they were very close to the border, Hamberlin testified that he was a "little bit nervous." He said they built a fire to warm their hands and then spotted the deer laboring to move in the distance. Hamberlin testified that he couldn't notify the Utah DWR because he and Hatch didn't have a phone signal. So Hamberlin purportedly left his rifle near the campfire as they continued to pursue the deer. He testified that they eventually saw the deer drop to the sand, at which point they waited about thirty minutes for it to die. Hamberlin explained that the spot where they waited was the location that investigators had

_____

4. Several of the trial exhibits were maps of the area. These maps indicate that White Pocket was 4.49 miles south of the kick-out location, which was 117 yards west of the carcass location, which was, in turn, 1.05 miles north of the Utah-Arizona border. Accordingly, the jury would have easily been able to see from these map exhibits that White Pocket was in Arizona, at least three miles south of the Utah border.

identified as the suspected shot location. He also claimed that Hatch had his tripod with him to use with his binoculars. After determining the deer had died, Hamberlin and Hatch walked over to the deer and proceeded to field dress it. He asserted that they then loaded up the head, the hide, and some of the meat into their packs and walked back to Arizona, where they met up with another member of their hunting party.

¶25   Hatch did not testify.

¶26   The jury convicted Hamberlin of wanton destruction of protected wildlife. And Hatch was convicted of assisting in wanton destruction of wildlife. However, Hatch was acquitted on the obstruction of justice charge because the acts supporting that charge had all occurred in Arizona; indeed, the State conceded in closing that it "probably didn't prove" the obstruction count and expressed that it did "not feel comfortable" asking the jury to return a guilty verdict on that count.

*The Motion for a New Trial*

¶27   Following his conviction, Hamberlin, represented by new counsel, filed a motion for a new trial. His motion rested on the assertion that his trial counsel (Counsel) had been ineffective in two critical ways. First, Hamberlin contended that Counsel failed to adequately investigate and present exculpatory expert testimony regarding the deer's cause of death and its ability to travel after being shot. This claim specifically highlighted a missed opportunity to seek a continuance to secure such an expert when Officer Stout presented what Hamberlin contended were previously undisclosed opinions during the trial. In support of this point, Hamberlin provided a veterinarian's affidavit. The veterinarian's affidavit proffered that a necropsy and dissection were essential for an accurate determination of the deer's cause of death. Furthermore, the veterinarian believed that the damage to the heart was likely not the direct cause of death and that biological evidence suggested that the deer's death was not

immediate. He would have opined that the death was probably due to prolonged bleeding and bacterial infection from gut leakage, combined with shock and blood loss. The veterinarian would have also testified that his review of the evidence suggested that "the subject deer had the strength to travel several miles after being shot." Hamberlin also argued that Counsel was ineffective for not asserting a due process violation based on the State's failure to preserve the deer's heart, which Hamberlin asserted was key evidence in the case.

¶28　The district court denied Hamberlin's motion for a new trial. The court provided specific reasoning for its decision, finding that Counsel was not ineffective in either area. Regarding the expert testimony claim, the court reasoned that Counsel's cross-examination of Officer Stout was thorough. Counsel successfully elicited testimony that there was no evidence of internal damage to the heart. The court noted that the State never presented evidence of internal heart damage, thus rendering a veterinarian's testimony on that specific point unnecessary. Additionally, the court noted that the defense *did* present Carter's testimony confirming that a gut-shot deer could indeed travel the distance Hamberlin claimed. Regarding the due process claim for not preserving the heart, the court similarly determined that Counsel was not ineffective. It reasoned that the State never contended "there was internal heart damage." Therefore, the court concluded—referencing Officer Stout's testimony—that preserving the heart would have offered no benefit in proving there was no bullet in the heart's chamber.

ISSUE AND STANDARD OF REVIEW

¶29　Hamberlin appeals, arguing that the district court should have ruled that Counsel was ineffective. "[W]hen a district court rules on a criminal defendant's claim that he was deprived of his Sixth Amendment right to counsel due to ineffective assistance, the district court's determination of whether the defendant

received constitutionally ineffective assistance is reviewed for correctness." *State v. Torres-Orellana*, 2024 UT 46, ¶ 6, 562 P.3d 706.[5]

ANALYSIS

¶30 To succeed on a claim of ineffective assistance of counsel, a defendant must meet two foundational legal requirements: first, proving that counsel's performance was deficient and, second, proving that this deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant's failure to establish either deficient performance or prejudice "defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (cleaned up).

¶31 To establish deficient performance, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Because there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, "even if an act or omission [was] inadvertent and not due to a

---

5. The State filed a motion to strike two footnotes in Hamberlin's opening brief on appeal that refer to comments made by a purported juror on an internet forum. Under rule 606(b)(1) of the Utah Rules of Evidence, the "court may not receive a juror's affidavit or evidence of a juror's statement" on "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict." The motion is granted, and we do not consider those footnotes in reaching our conclusions herein. *See Jessop v. Hardman*, 2014 UT App 28, ¶ 29, 319 P.3d 790 (concluding that a trial court was "well within its discretion" to strike a declaration describing jury "deliberations themselves and one juror's opinion of other jurors' mental states and voting motivations").

purposeful strategy, relief is not automatic," *State v. Torres-Orellana*, 2021 UT App 74, ¶ 28, 493 P.3d 711 (cleaned up), *aff'd*, 2024 UT 46, 562 P.3d 706. The ultimate question in determining deficient performance remains "whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶32 To establish prejudice, the defendant must show that the deficient performance harmed the defense. *Strickland*, 466 U.S. at 687. This means that "a defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (cleaned up), so as to erode our "confidence in the outcome," *Strickland*, 466 U.S. at 694. "In determining prejudice, an appellate court should consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *Torres-Orellana*, 2021 UT App 74, ¶ 29 (cleaned up). Courts are "more readily" inclined to conclude errors are "harmless when confronted with overwhelming evidence of the defendant's guilt." *State v. King*, 2010 UT App 396, ¶ 35, 248 P.3d 984. Conversely, they "are more willing to reverse when a conviction is based on comparatively thin evidence." *Id.*

## I. Failure to Obtain an Expert

¶33 Hamberlin first argues that the district court erred when it determined that Counsel did not provide ineffective assistance in failing to obtain an expert who could have provided purportedly exculpatory evidence about the cause of the deer's death. Specifically, Hamberlin asserts that an "expert would have opined that the biological evidence supported that the deer could have lived long enough to travel into Utah" after being shot in Arizona. Considering "the defense's theory of the case that

[Hamberlin] shot the deer in Arizona and tracked it into Utah before the deer died," Hamberlin argues that "reasonable counsel would have understood that a crucial question would be whether the deer could have traveled the distance in question after being shot" because it "was critical to know why and when the deer died." He argues that this "evidence did not come in through any other witness, leaving a significant gap in the evidentiary picture."

¶34   This claim of ineffective assistance fails on both the deficient performance and prejudice prongs. We address each in turn.

¶35   Counsel did not perform deficiently in failing to obtain an additional expert who could opine about this specific deer's cause of death. As our supreme court has made clear, "counsel has a duty only to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Menzies v. State*, 2014 UT 40, ¶ 183, 344 P.3d 581 (cleaned up), *abrogated on other grounds by McCloud v. State*, 2021 UT 51, 496 P.3d 179. And while "there must be a reasonable, articulable reason for not interviewing a particular witness or for not following a particular lead, . . . the mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Id.* (cleaned up). Instead, in "any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

¶36   Here, the record is clear that Counsel did recognize the need for an expert witness in this case. After all, Counsel retained a retired Utah DWR officer with a degree in wildlife management to testify as an expert witness. Hamberlin—in hindsight—

maintains that Counsel should have hired an additional expert with a background in veterinary medicine. While it is true that Counsel did not hire the expert that Hamberlin now insists he should have hired, that does not mean that Counsel failed to conduct a reasonable investigation as required by the Sixth Amendment. After all, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. It is entirely within the realm of adequate assistance for counsel "to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. This means that even when there are "any number of hypothetical experts . . . whose insight might possibly have been useful," counsel is nevertheless "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011).

¶37  Given the discretion to engage in reasonable trial tactics and strategies, it was also reasonable for Counsel to opt to avoid transforming the "case into a battle of the experts." *Id.* at 109. Whether to choose one particular expert over another is a quintessential strategic decision that we are loath to second-guess with the benefit of hindsight. *See State v. Houston*, 2015 UT 40, ¶ 90, 353 P.3d 55 (characterizing the assertion "that appellate counsel would have called and retained different experts than those trial counsel decided to present to the jury" as a tactical decision); *Brown v. State*, No. 09-22-00057-CR, 2023 WL 5948365, at *3 (Tex. App. Sept. 13, 2023) (stating that because the court could "imagine a strategic motivation for not retaining or calling another expert," the defendant had "failed to overcome the presumption that this was sound trial strategy"); *Hall v. State*, No. E2004-01635-CCA-R3-PD, 2005 WL 2008176, at *32 (Tenn. Crim. App. Aug. 22, 2005) ("Counsel's decision not to call another expert is one of trial strategy, and we will not second-guess that decision on appeal.");

*cf. McCloud v. State*, 2021 UT 51, ¶ 38, 496 P.3d 179 ("Counsel did not perform deficiently by not consulting experts; rather, he made a reasonable strategic decision based on the law and facts of the case and his theory of the defense.").

¶38 One reasonable strategic basis for Counsel to choose *not* to call the veterinary expert Hamberlin now suggests was to avoid the risk of the State calling its own rebuttal experts. For instance, calling an expert in veterinary medicine would have risked the State responding by calling its own veterinary medicine expert—or experts—in rebuttal. The State had, in fact, informed the district court that it was prepared to do so when it indicated it had been in contact with two other experts: (1) an experienced heart surgeon who had "shared his professional opinion about the many ways a laceration to the heart would be fatal" and (2) a doctor of veterinary medicine who worked for the Utah DWR and who would have countered the claims of Hamberlin's proposed expert.

¶39 In this scenario, Counsel would know that Hamberlin faced a numerical disadvantage, with the State having more experts than Hamberlin. Thus, Counsel could have reasonably wanted to steer clear of what looked like a losing battle and avoid giving the State a chance to present more robust testimony through these additional experts. This demonstrates how the decision to hire a particular expert, or to forgo one, is often a deeply strategic choice aimed at managing potential risks and advantages in court—a decision on the part of counsel that is inherently reasonable in many circumstances, this one included. Moreover, Counsel had vigorously cross-examined Officer Stout and likely reached the reasonable conclusion that he had made the points he needed to make, thus reducing the need for an additional expert.

¶40 In addition to failing to show deficient performance, Hamberlin has also not demonstrated how he was harmed—even

if we were to assume that Counsel's performance fell short of reasonable representation. Several reasons compel this conclusion.

¶41   First, the State never argued that there was internal damage to the heart. Nor did Officer Stout ever testify that there was internal damage to the heart. Rather, he said the bullet fragment went "through-and-through" along the side of the heart. More specifically, he clarified that he did not see an "exit hole" caused by a bullet. Instead, he found a wound "on the edge of the heart, not . . . going through the heart" but "[i]nto the heart on the side." And he documented exactly what he observed through photographs, which were introduced at trial and available for review by any expert. In other words, the State never presented evidence that the deer was shot in the heart such that it caused any internal damage. The expert evidence that Hamberlin asserts should have been obtained would have, at best, offered additional evidence about the damage to the heart, but the amount of damage to the heart was never really in question.

¶42   Second, there was abundant physical evidence that the deer was in Utah when it was shot, was shot from a point in Utah, and died in Utah. Investigators pinpointed where the deer was located when it was shot. From this location, they determined the path it took to the spot where it died. Moreover, they identified the location from where the shot was likely taken. And perhaps most telling, all the deer's tracks were found entirely in Utah. For Hamberlin's account to have been believable to the jury, there would have to be some evidence of deer tracks leading from Arizona into Utah. But none were found—in spite of the fact that they would likely have been readily visible along with the tracks that were found in Utah. Hamberlin has not assailed or undercut the evidentiary picture these facts established.

¶43   In addition, the competing hunting party heard a nearby shot and then saw Hamberlin and Hatch field dressing the deer

no more than fifteen minutes later. And, if the deer had been shot in Arizona, Hamberlin would have needed more than fifteen minutes to get to the location in Utah where he and Hatch began field dressing it for his story to be credible. In short, given this abundant evidence that the deer was never in Arizona during the events that resulted in its death, there is simply no likelihood of a better result for Hamberlin even if his proposed expert had testified. Even had his expert testified that the deer could have traveled for some distance after having sustained a wound to the heart such as it suffered, it would do nothing to overcome the weighty evidence that the deer was in Utah during the entire episode. As such, any testimony Hamberlin's proposed expert could have offered would likely have been inconsequential in swaying the jury to adopt Hamberlin's version of events.

¶44   So, while the damage done to the heart was relevant to the cause and timing of the deer's death, we do not see a reasonable probability that any evidence that Hamberlin's expert could have offered in this respect would have overcome the plentiful evidence that Hamberlin shot the deer in Utah. And Hamberlin has not offered a persuasive argument that the jury would have returned a more favorable verdict had it heard the testimony of his proposed expert.

¶45   Because Hamberlin has failed to show either deficient performance or prejudice, we detect no error in the district court's conclusion that Hamberlin did not receive ineffective assistance of Counsel on this point.

## II. Failure to Move for a Continuance

¶46   Hamberlin also argues that the district court erred in concluding that Counsel did not provide ineffective assistance despite the failure to seek a "continuance to obtain an expert at trial when [Officer Stout] gave opinions at trial about the damage to the deer heart and cause of the deer's death." This assertion is

unsuccessful for the same fundamental reasons that his first claim failed.

¶47    First, Counsel did not perform deficiently in deciding to forgo seeking a continuance that would have likely transformed the case into a battle of the experts—a battle which would have likely ended up, for the reasons we have identified, compromising Hamberlin's case more than helping it. *See supra* ¶¶ 37–39.

¶48    Second, for the same reasons as identified, *see supra* ¶¶ 41–44, we conclude that Hamberlin was not prejudiced by this alleged deficiency. In other words, there is no reasonable probability that additional expert testimony would have changed the evidentiary landscape that led to the conclusion that Hamberlin shot the deer in Utah.

### III. Failure to Allege a Due Process Violation

¶49    Hamberlin's final claim is that the district court incorrectly concluded that Counsel did not provide ineffective assistance for failing to allege a due process violation based on the State's failure to preserve evidence. Hamberlin argues that the State should have preserved the deer's heart, dissected it, and taken samples from it. He asserts that this evidence would have been exculpatory because it would have shown "that the heart did *not* have internal damage from a bullet fragment."

¶50    "To determine whether the State's [loss or] destruction of potentially exculpatory evidence violates due process, the Utah Supreme Court has established a threshold requirement that is followed by a balancing test." *State v. Steele*, 2019 UT App 71, ¶ 15, 442 P.3d 1204 (cleaned up). A defendant must "establish as a threshold matter a reasonable probability that the lost or destroyed evidence would have been exculpatory." *State v. DeJesus*, 2017 UT 22, ¶ 19, 395 P.3d 111. "Only after the defendant has established this point—and accordingly established that there

was a due process violation resulting from the loss of evidence—should a court" move on to "balance the culpability of the State and the prejudice to the defendant in order to gauge the seriousness of the due process violation and to determine an appropriate remedy." *Id.* ¶¶ 27, 29.

¶51    Hamberlin develops this argument under *State v. DeJesus*, 2017 UT 22, 395 P.3d 111, and *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, the latter being the foundational case addressing preservation of evidence in Utah. Hamberlin is unable to demonstrate that *DeJesus* and *Tiedemann* are applicable here because he "cannot meet the threshold requirement of showing a reasonable probability that the [heart] would have been exculpatory." *See State v. Mendoza*, 2025 UT App 46, ¶ 20, 568 P.3d 265, *cert. denied*, 570 P.3d 661 (Utah 2025). At most, it would have shown that the bullet fragment never caused any internal damage to the heart. But this is no different from what Officer Stout said, namely that the fragment went through the side of the heart, causing a laceration or glancing injury to the organ.

¶52    The district court's determination that Counsel was not ineffective for failing to allege a due process violation concerning the deer's heart was based on the State's position that it did not contend that any internal heart damage had occurred. Consequently, the court said that "there was no reason to save a heart to dissect it." In other words, the heart's preservation would not have helped Hamberlin's defense because it related to a point no one was contesting—that there was no bullet in the heart's chambers. Indeed, Officer Stout's opinion on the deer's cause of death did not hinge on whether the heart's chambers had been penetrated. Even though Officer Stout's examination already indicated that a bullet fragment had not entered the heart, Hamberlin still argues that proper preservation and dissection of the heart would have confirmed no internal damage from a bullet fragment. He asserts that such evidence would have undermined Officer Stout's claim that a bullet fragment "entered the heart"

and caused the deer's death. But again, that was not Officer Stout's testimony.

¶53    Hamberlin's proposed expert—the veterinarian—asserted in his affidavit that there was "substantial evidence that the wound found on the surface of the heart did not enter the chamber (inside) of the heart." Indeed, the veterinarian even cited Officer Stout's testimony that the wound was "on the side" of the deer's heart to support his opinion. The veterinarian goes on to state that an injury "to the heart muscle would not in and of itself be a fatal injury." But nowhere does the veterinarian assert that preserving the heart for later examination would have done anything to show that the wound to the heart was something other than what Officer Stout had testified to—a laceration to the side of the heart. Thus, a later physical examination of the heart would—according to the veterinarian—not have shown any more or any less damage than what Officer Stout had already testified to. Given that— according to the veterinarian—preserving the heart for later examination would have shown what was already revealed in Officer Stout's testimony, we fail to see "a reasonable probability" the heart evidence "would have been exculpatory." *DeJesus*, 2017 UT 22, ¶ 19.

¶54    Hamberlin's proposed expert also stated that had the heart been preserved, tests could have been performed to determine how long the deer lived after it had received the wound to the heart. Specifically, he stated that testing could determine "whether a wound was inflicted less than 5 minutes, 5–15 minutes, or 15 minutes to several hours before death." (Quoting an unidentified medical or forensic journal.) The veterinarian then asserted that such testing on the heart would have "disproven the prosecution's assertions" that "the deer died in ten seconds" after being shot and would have shown the members of Dieringer's group "were lying."

¶55   The problem with the veterinarian's claims is that the prosecution never asserted that the deer died within ten seconds after being shot. Rather, insofar as our reading of the record indicates, Officer Stout testified that the deer *ran* for "a matter of seconds" after being shot. Specifically, the prosecutor argued that the deer got shot, jumped up, ran 117 yards, and then died. From this, it appears that Hamberlin's proposed expert calculated that this "would [have taken] approximately ten seconds to transpire" and stated that the prosecution represented that the deer died ten seconds after being shot. But this is not what the State argued—it argued the deer ran 117 yards to the spot where it *eventually* died, not that the deer dropped dead after ten seconds. What the veterinarian suggests is nothing more than a straw-man argument constructed to defeat an imagined assertion falsely attributed to the prosecution. As such, it does not meet the threshold of establishing reasonable probability that the heart would have been exculpatory. Put more bluntly, the veterinarian's opinion about how lost evidence could defeat a phantom argument simply is of no help to Hamberlin. Rather, it is "only speculation as to what forensic evidence might have been found." *Mendoza*, 2025 UT App 46, ¶ 20 (cleaned up). It certainly "does not rise to the level of reasonable probability," which is required to establish that lost or destroyed evidence "would have been exculpatory." *Id.* (cleaned up). Our supreme court has stated that "a reasonable probability" in the *Tiedemann* context "is a probability sufficient to undermine confidence in the outcome." *State v. Mohamud*, 2017 UT 23, ¶ 20, 395 P.3d 133 (cleaned up). But "there must be more than speculation" that the evidence would have shown something other than what was expressly conceded by the prosecution. *Id.*

¶56   Ultimately, Hamberlin's claim of ineffective assistance fails because he cannot demonstrate that the heart evidence would have been exculpatory. Therefore, Counsel had no grounds to raise a *Tiedemann* claim and did not perform deficiently by failing to do so.

CONCLUSION

¶57 Hamberlin has not demonstrated that he received ineffective assistance when Counsel did not hire an additional expert, did not move for a continuance, and did not allege a due process violation. Accordingly, his conviction is affirmed.

————————